No. 24,268.

E. L. RICKEL, *Appellant*, v. THE ATWOOD EQUITY COÖPERATIVE EXCHANGE, *Appellee*.

SYLLABUS BY THE COURT.

1. DAMAGES—*Sale of Wheat—Request for Peremptory Instructions for Plaintiff Properly Denied*. It is not error for the trial court to refuse a peremptory instruction for plaintiff, when there is competent evidence upon which the jury may find for the defendant.

2. SAME—*Special Question Properly Refused*. It is not error for the trial court to refuse to submit a special question, which obviously places an erroneous interpretation upon a question submitted, and upon which it is predicated.

3. CONTRACT—*Sale of Wheat—Conspiracy to Defraud—Proper Instructions*. In an action for damages for failure to deliver wheat, which plaintiff claimed to have purchased from defendant through its manager, the defendant denied the contract of purchase relied upon by plaintiff, and alleged that if any contract was made, it was in furtherance of a conspiracy between plaintiff and defendant's manager to cheat, wrong, and defraud the defendant. The evidence examined and, *held*, sufficient to authorize the court to submit instructions to the jury on the question of conspiracy.

Appeal from Rawlins district court; WILLARD SIMMONS, judge. Opinion filed June 9, 1923. Affirmed.

*C. W. Burch, B. I. Litowich,* and *La Rue Royce,* all of Salina, for the appellant.

*Fred Robertson,* of Kansas City, and *Herbert Howland,* of Atwood, for the appellee.

The opinion of the court was delivered by

HARVEY, J.: This is an action for damages for the failure to deliver wheat which plaintiff claimed he purchased from defendant. There was a trial to a jury, verdict and judgment for defendant and the plaintiff appealed.

The plaintiff was a grain dealer at Salina. The defendant operated a grain elevator at Atwood, Kan., which was managed by Wm. J. Manning. Plaintiff claimed that, on August 12, 1919, he purchased, by telephone from the defendant, through its manager, two capacity cars of No. 1 hard wheat for prompt shipment at $2.21 per bushel, K. C. basis, which contract was evidenced by mailing to defendant a confirmation of purchase as follows:

"CONFIRMATION OF PURCHASE.

"E. L. RICKEL—GRAIN                                    No. 1257
*Receiver and Shipper.*                    SALINA, KANSAS, August 12, 1919.
*Farmers Elevator Co., Atwood, Kansas.*

"We hereby confirm PURCHASE from you today by phone 2 capacity car No. 1 dark hard wheat at $2.21 per bu. Basis Kansas City. Prompt shipment. No. 1, 2, 3 hard wheat to apply. Destination weights and grades. Wire for billing.

To be billed to ————————

"Lower Grades to apply as follows: Government discount.

"Cars must be loaded to capacity as required by railroad companies. Seller to pay all weighing, inspection, trackage and interest charges, if any. Seller should always advise of shipments stating kind of grain, probable grade and number of bushels in each car. When shipments are not made according to contract we reserve the right, without further notice, to extend time of shipment, cancel or buy in the grain for the seller's account, unless at seller's request previous to expiration of limit of time of shipment, other arrangements are made covering seller's failure to make shipment within specified time of this contract. We reserve the right to change destination of all shipments, provided point at which weights are to be obtained is not specified above. It is understood that this contract is not completed until all shipments are received, graded, weighed and accepted at destination or at points specified above. Reconsigned grain not applicable on this contract except by special agreement. In all other respects this contract is subject to the rules and regulations of the Kansas City Board of Trade and receipt of this contract by the seller, without immediate notice to us of error, is an acknowledgment of the acceptance of all the conditions thereof. Make drafts with bills of lading attached and properly endorsed on us at Salina, Kansas, leaving . . . margin to protect weights and grades.

"E. & O. E.                                    E. L. RICKEL—GRAIN,
"This Contract is Accepted          By (Signed)   W. W. WRIGHT.

----------------------------------------

"Please sign and return.              .    .              Thanks."

Appellant further alleged that he also made the following purchases: August 13, two capacity cars at $2.23, Kansas City basis, shipment as soon as possible to obtain cars at Minneapolis, Minn. No. 1, 2, 3, hard wheat applies on the contract; August 20, two capacity cars at $2.24, Kansas City basis, No. 3 or better, September shipment; August 21, five capacity cars No. 2 hard wheat at $2.10, f. o. b. Atwood, shipment on or before September 30; August 24, two capacity cars No. 2 hard wheat at $2.09 f. o. b. Atwood, September, October, November 15, shipment, and on August 26, two capacity cars No. 4 hard wheat at $2.21½ Kansas City basis, September shipment, to be billed to Atchison.

Plaintiff further alleged that one car was shipped of the purchase of August 12, but that none of the other cars had been shipped, and that there were due him fourteen cars of wheat under these contracts; that each of the contracts of purchase was made by telephone, followed by a confirmation of purchase in the same wording as that set out, except as to the number of cars, price, etc.; that none of the confirmations had been accepted in writing by defendant and returned to him; that the form used for the confirmation of purchase was his individual form; that he had extended the time of delivery, under his option to do so as recited in the confirmation of purchase, and that, under date of November 19, 1919, for the purpose of further confirming his purchases from defendant, he mailed to defendant a memorandum in writing as follows:

*"Atwood Equity Co-op. Exchange, Atwood, Kansas.*        NOVEMBER 19, 1919.

"Gentlemen—According to our records there are fourteen cars of wheat yet due us on contract. These cars are due on the following contracts:

"Con. No. 1257—dated Ang. 12th—No. 1 Dk at $2.21 per bushel—Basis K. C.

"Con. No. 1271—5 cars—dated Aug. 21st—No. 2 & 3 Dk Hd at $2.10 per bushel—basis K. C.

"Con. No. 1285—2 cars—dated Aug. 26th—No. 3 Dk Hd at $2.21½ per bushel—basis K. C.

"Con. No. 1258—2 cars—dated Aug. 13th—No. 3 Hd at $2.23 per bushel—basis K. C.

"Con. No. 1270—2 cars—dated Aug. 20th—No. 3 wheat at $2.23 per bushel—basis K. C.

"Con. No. 1405—2 cars—dated Aug. 24th—No. 3 wheat at $2.09 per bushel f. o. b. shipping point.

"Please check these over with your records, and see if they agree. If not, call to our attention promptly. When loading this wheat for shipment, please call us at our expense for billing.        Yours truly,

E. L. RICKEL—GRAIN,
By (Signed) W. W. WRIGHT.

"U. S. Food Adm. License No. G 153298.

"U. S. Wheat Director License No. 013662 H."

Receiving no response he alleges that he went to Atwood in December, 1919, and that defendant wrote and endorsed upon the written memorandum "Atwood Equity Co-op. Exch. Wm. J. Manning, Manager." That by letters and telegrams thereafter he attempted to have this wheat delivered, but that finally on January 31, 1920, defendant refused to recognize that it had any contract with plaintiff, and that plaintiff then advised defendant that he was taking necessary steps to protect his interest, and that in the

Rickel v. Coöperative Exchange.

month of February, 1920, he purchased fourteen cars of wheat at a cost of $7,382 more than the wheat would have cost him had defendant delivered, and for which sum he claimed damages. Defendant, in its verified answer, admitted its incorporation and the address of its parties, made a general denial and specifically denied,

"That plaintiff purchased from it any wheat as alleged in its petition; denies the receipt, acceptance and execution by it of any confirmations of sale, as alleged in said petition; denies that said W. J. Manning, as its manager, agent or otherwise, ever at any time mentioned in said petition had any right, power or authority to enter into any contracts whatsoever such as are set forth therein, for and on behalf of this defendant; denies that the so-called written memorandum of date November 19, 1919, set forth in said petition, was signed by said Manning upon the date that it bears, and alleges same was not in fact signed by him, until about the time he ceased to be manager of defendant, which was January 27, 1920, and when said Manning placed his name thereon the same was done by him wholly without authority to in any manner bind the defendant, without consideration, and in furtherance of a conspiracy between said plaintiff and said Manning, entered into between them at a time and place unknown to defendant, to cheat, wrong and defraud this defendant by causing it to furnish wheat to plaintiff at prices greatly below the market value at the time of delivery thereof, all to the great profit of plaintiff and to the injury and damage of defendant; that said conspiracy so entered into between said plaintiff and said Manning ever since its inception constantly has been and still is in existence and in full force and effect."

Plaintiff filed a verified reply consisting of a general denial.

On behalf of the plaintiff, the evidence tended to show that during the month of August he called up the defendant by long distance telephone, and made the purchases of wheat as alleged, following each one with a written confirmation; that the confirmations were not signed and returned to him; that one car of wheat was delivered to him in the latter part of August, which he paid for; that he had extended the time of shipment by telephone from time to time, and that by letter of October 18, had extended the time of shipment on all contracts to October 31. On October 29, he wrote defendant asking that the confirmations be signed and returned. This was not done. That for the purpose of having his confirmations acknowledged he mailed defendant a letter on November 19, setting out the particular contracts he claimed to have, and asking that defendant check them up and again asked that the confirmations be acknowledged; that sometime in December, having received no answers to any of his letters, he went to Atwood and asked defendant's man-

ager, Manning, to sign the acceptances on the confirmations. Manning replied that he could not find the confirmations, but that he would sign plaintiff's letter of November 19, with the understanding that such signature would answer the same purpose as the written acceptances on the confirmations. This was satisfactory to plaintiff and Manning did sign the letter dated November 19 as follows: "Atwood Equity Co-op. Exch., Wm. J. Manning, Manager." That on December 11, he received a telegram from defendant stating, "Will ship grain as fast as conditions will permit," and that on December 12, he received another telegram from defendant with the same wording; that on December 29, he wrote defendant:

"We have been waiting very, very patiently for some wheat. Can't you possibly get some of this stuff out? Don't let anybody have this wheat because we are certainly needing it very much. Must have some to fill a few of our sales soon. Wire us upon receipt of this letter what the prospects are for shipment of at least a few cars on contract. Give this your personal attention, as it is very important."

That on December 31, he wrote defendant a long letter complaining about the delay in shipping the wheat, and stating that he was taking it up with the railroad administration and grain corporation as to the necessity of having fourteen cars furnished defendant immediately in which to transport wheat. That he received no replies from any of these letters. On January 14, 1920, he wired defendant, "Can you bill two cars St. Joseph by January 24. Answer by wire," and that on the same date he received an answer, "Yes, St. Joseph." And that on the same date he wired defendant, "Bill all wheat Superior, Neb., care Santa Fe." And that on January 23, he wrote defendant again urging the shipment of the wheat. Plaintiff further testified that he went to Atwood, about January 25, and met the board of directors and showed them his confirmations and asked them what they knew about the matter, and they told him they did not know anything. That later in the day he again met the board of directors and Manning at the bank in Atwood, and that Manning there told the directors, in his presence, that he had made the contracts. The defendants stated they knew nothing about the matter, wanted copies of plaintiff's contract, which he declined to give, and the directors finally told him that they would give him a definite answer by the next Saturday, and that on the next Saturday he received a telegram from defendant reading as follows: "The board of directors have gone over their records carefully and cannot

find any record of any contracts with you." Plaintiff then wired defendant that he would take steps to protect himself and that thereafter and during the month of February he bought at various places in northwest Kansas, fourteen cars of wheat, which cost him $7,392 more than his contract price with plaintiff.

The evidence further tended to show that Manning was the manager of defendant and had authority to buy and sell wheat; that on December 6, the board of directors had a meeting at which they instructed Manning to ship out all the wheat then on hand, not to buy any more wheat, and that a man was employed for the purpose of seeing that Manning carried out the orders of the board of directors. The secretary of the defendant and an auditor for the defendant company were engaged in the months of December and January in going over the books of the company, and that they never at any time found any confirmations, letters, telegrams or any other papers pertaining to any contract with plaintiff. There was not good feeling between Manning and the directors of the defendant company; Manning and the auditor had some disagreement and on January 27, Manning was let out of his employment. Manning told the directors that there were no contracts outstanding for the sale of wheat (except for seven cars, not to this plaintiff, confirmations of which were in the safe). He was very confident about this and on being pressed said: "I hope God may strike me dead if there are any other contracts out." The next morning, January 28, the plaintiff called Sill, president of the defendant company, over the telephone and told him that he understood their manager had quit, and asked Sill what he knew about plaintiff having contracts with the defendant for fourteen cars of wheat, and Sill told him that he knew absolutely nothing about it. Plaintiff told Sill that copies of his contracts were at the bank in Atwood, where Sill could see them. Sill went to the bank and found no contracts. On the next day, January 29, the plaintiff and Noll, a grain dealer of Salina, appeared at a meeting of the directors of the defendant company at Atwood, and the plaintiff claimed to have contracts with the defendant for the purchase of fourteen cars of grain. The papers were found concerning the purchase of the two cars by Noll and the company filled those contracts. The board of directors were suspicious that the plaintiff had no valid contracts, and asked plaintiff if he had seen Manning that morning and he replied in the negative, and Noll spoke up and answered that they had seen him. Plaintiff insisted on defendant's answer as to whether defendant would fill

the contracts he claimed to have for fourteen cars of wheat. They wanted a little time to consider it and arranged a meeting with him at the bank that afternoon. At that meeting the directors were present and their attorney, Dempster Scott, and the president of the bank, Prochazke. At that time the plaintiff insisted on having his contracts filled. The directors told him that Manning had informed them that he had 'no contracts. Manning was sent for, and was asked by the directors if he had made those contracts, and he said that he had. He was then asked, in the presence of plaintiff, if he had not told the board of directors at their meeting a day or two before, that he had no contracts outstanding, except certain ones to Noll and another firm, and he answered and said yes, he had told them that, but that he had a purpose in telling it. Prochazke stated that plaintiff had been to Atwood, and that he had been at the bank about ten days before that meeting, and he fixed the time about January 17, and that he had not been there in December. At the trial plaintiff testified that he had been to Atwood only twice before the trial, once when he had the letter of November 19, signed by Manning, and once when he met the board of directors, and in answer to a question on re-direct examination as to what papers he showed Prochazke, when he saw him at the bank on January 17, he answered stating what papers they were. At the meeting of plaintiff and the directors at the bank on January 29, Manning told the plaintiff, that there was nothing in these contracts for him anyway, for they could be filled that day in Atwood at a less price per bushel than the contracts called for, and the evidence at the trial was overwhelming that the contracts could have been filled at Atwood, on January 31, or on February 2, 3, or 4, at a price less than plaintiff claimed to have purchased this wheat for. At the bank meeting it was agreed that defendant would give plaintiff a definite answer January 31, as to whether or not they would recognize the contracts he claimed to have, and on that date they wired him, in effect, denying that they had any contracts with him. The rules of the Kansas City, Mo., board of trade were offered in evidence, the pertinent section of which reads as follows:

"On all contracts where shipment is to be made within forty-eight (48) hours after expiration of that time of any default. In the absence of such notice the buyer may, at his option, make settlement in fulfillment of such contract, either by cancellation or based upon the market price at that time or upon the price necessarily paid in the open market not later than the next succeeding business day."

The evidence showed there had been a material advance in the price of wheat from August to December and January.

At the trial the jury returned answers to special questions as follows:

"No. 1.  Did the defendant buy and sell grain by Wm. J. Manning as its manager?  Answer: Yes.

"No. 2.  If you answer yes to question No. 1 then state when, if ever, prior to January 31st, 1920, Defendant cancelled this authority?  Answer: Jan. 27, 1920."

The court refused to submit to the jury the following special question requested by plaintiff:

"No. 3.  If you answer yes to question No. 1, then state when notice of such cancellation was given to plaintiff and how such notice was given."

Appellant complains, first, of the refusal of the court to instruct the jury to bring in a verdict for plaintiff.  Under the evidence in this case, the jury might have decided for the defendant on the theory that, even if the purchases were made as claimed by plaintiff, the contracts were not extended in accordance with the confirmations, but were, in fact, cancelled and lay dormant for many months, or the jury might have decided for defendant upon the evidence that on January 31, the date plaintiff chose to regard the contracts as repudiated, the contracts could have been filled by the purchase of wheat at Atwood, at a price which would have occasioned no loss to plaintiff.  Of course, if there was any proper theory under which a verdict for defendant might be sustained, it was not error for the court to refuse to give a peremptory instruction for plaintiff.

Appellant complains that the court did not submit the special question above quoted.  This question placed an incorrect interpretation upon question No. 1, to which it referred, and for that reason it was not error for the court to refuse to submit it.

Appellant contends that the court erred in giving instructions on conspiracy.  This is appellant's principal ground of error and it is ably presented with exceptional thoroughness.  The forms of the instruction on this branch of the case are not objected to, indeed, they appear to be copied from standard texts, or adjudicated cases, and are not objectionable as to form.  The issue of conspiracy was raised by the pleadings.  It is the universal rule that it is the duty of the court to give instructions upon an issue in the case raised by the pleadings which is supported by evidence.  The appellant clearly

recognizes this rule, but he makes the point that there is no evidence in this case to support the allegations of conspiracy, hence, the court was not justified in giving instructions on that question. Concerning the quantum of proof necessary to support an allegation of conspiracy in a civil case, the rule is concisely stated in 12 Corpus Juris 639, as follows:

"In order to establish a conspiracy evidence must be produced from which a party may reasonably infer the joint assent of the minds of two or more parties to the prosecution of the unlawful enterprise. Disconnected circumstances any one of which, or all of which, are just as consistent with a lawful purpose as with an unlawful undertaking are insufficient to establish a conspiracy. However, the doctrine of reasonable doubt has no place in a civil suit for damages where it is sufficient if the evidence is full, clear and satisfactory, and the conspiracy established by a preponderance of the evidence. This degree of proof, however, is necessary. The evidence must do more than raise a suspicion. It must lead to belief."

And further, as to instructions, it is said:

"The jury should be instructed as to the principles of law applicable to conspiracy, on the facts disclosed by the evidence, and also as to the persons who must be found to have united in the confederacy. As in other civil actions, instructions should not be given in the absence of evidence to sustain them." (p. 645.)

It is well settled by the authorities that conspiracy, when charged either in a civil or a criminal case, may be proved by circumstantial evidence. It is proper to prove the charge by direct evidence, but as the direct evidence is ordinarily in the possession and control of the alleged conspirators, frequently the opposing party cannot obtain it. Hence, in actual practice, it is usually proved by circumstantial evidence, and where the charge is made its tendency is to open rather a wide field of inquiry. (12 C. J. 634; 5 R. C. L. 1103; 2 Wharton's Criminal Evidence, 1671, and cases cited.)

The defendant was entitled to ask the jury to view the evidence as favorably to it as could be reasonably done. So viewed, the evidence shows: That the contracts were made in August; plaintiff used his personal form of confirmation which provided a place for the seller to sign his acceptance. This was not done. That plaintiff regarded this as material is shown by his efforts later to get the confirmations accepted in writing. The situation was not such that he could rely on their receipt by defendant without objection as being an acceptance, (*Wallingford v. Grain Co.*, 100 Kan. 207, 164 Pac. 275, and allied cases) or at least it is evident plaintiff did not so regard it, for on October 29, he wrote asking that the confirmations be accepted

and returned, and wrote again November 19, and finally went to Atwood, for that purpose. The confirmations never were signed. By the terms of the confirmations, in the event the seller did not ship within the time provided in the contract of purchase, the buyer had the option, (1) to extend the time, (2) to cancel the contract, (3) to buy on the market. If he bought on the market, to hold the seller liable, he must buy within forty eight hours. Plaintiff never did that. Did plaintiff extend the time? The only written evidence of that is plaintiff's letter of October 18, extending the time of all shipments to October 31, but this was approximately two months after the contracts were supposed to have been made, and long after all of them, (except one) should have been filled. There was oral testimony that the contracts were extended by telephone, but the jury was not compelled to believe that, especially of Manning,—he so thoroughly discredited himself as a witness that one would feel like apologizing for asking a jury to believe him. Plaintiff's other alternative was to cancel the contracts. At the time they were made it was not so material to plaintiff whether the wheat was shipped or not. The threshing season was on, wheat was plentiful and could be bought almost anywhere without financial sacrifice to plaintiff, possibly at a saving, for there is evidence that on some of the contracts the price was above the market at that time. The fact that plaintiff paid no attention to them for about two months, and very little attention to them for four or five months, might warrant the jury in believing that he had cancelled them, as under his confirmations he had the option so to do. When the price of wheat advanced until, in December and January, it was evident that the old contracts at the August price would be very profitable,—the price, January 31, at K. C. was $2.72,—so these August contracts, if revived, would be worth about 50 cents per bushel. Plaintiff undertook to revive them by having his confirmations accepted, and wrote the letter of November 19. Later he went to Atwood to get the acceptance. Naturally, if plaintiff already had valid contracts, which had been properly extended, he needed nothing more, but he thought he needed an acceptance in writing, and he felt so sure of his need of acceptances in writing that he personally went to Atwood to get them. The record does not leave it clear when he went to Atwood. He testified he went there in December, about the middle or fore part, and that he got Manning's signature at that time to the letter dated November 19. He was asked:

"Q.  You say you got that signed?  A.  Yes, sir.

"Q.  Signed in the middle of December?  A.  To the best of my knowledge, yes, sir."

He further stated that on that occasion he went to the bank and asked the president, Prochazke, about the financial standing of defendant and learned it was good.  He told Prochazke that defendant had failed to deliver him fourteen cars of wheat for which he had contracts.  Prochazke asked him if he had seen the directors, plaintiff said he did not want to see the directors as long as they kept Manning for their manager.  Prochazke says this conversation was in January, about the 17th, that plaintiff was not at his bank in December.  On rebuttal plaintiff testified that when he saw Prochazke at the bank on January 17, he showed him Exhibits 1 and 12. Plaintiff says he was at Atwood only two times, once on the occasion when he saw Manning and Prochazke, and again at the board meeting January 29.  So, if Prochazke is correct about the date of plaintiff's first visit to Atwood, it was in January, about the 17th, and plaintiff was not there in December, and Manning did not sign the letter dated November 19, before January 17, and possibly did not sign it until January 29, for there is evidence tending to show that the plaintiff saw Manning on the morning of January 29, though he tried to keep that fact from defendant's directors.  Manning did not get along well with defendant's directors.  As early as December 6, a man was employed to see that Manning carried out the orders of the board of directors, and he was then ordered not to buy any more wheat and to ship out all the wheat then in the elevator. When the relations between them became so strained that he quit, or was discharged, on January 27, he positively assured the board of directors that there were no outstanding contracts for the sale of wheat (except for seven cars, not to this plaintiff, the confirmations of which were found in the safe).  Two days later Manning, in the presence of plaintiff, told the directors that he had made these contracts.  When asked why he had told them he had no contracts, he stated that he had a purpose in doing that.  Manning was called as a witness for plaintiff and seemed to be willing to aid plaintiff in this suit.  Had the purpose which Manning had in his mind been anything that would have helped plaintiff, no doubt plaintiff would have had him tell it.  Manning quit, or was discharged, late in the evening.  Early the next morning, plaintiff called defendant's presi-

dent, and told him he understood his manager had quit. How did he get this information so soon? Plaintiff says that is not material. When plaintiff and Manning were charged with a conspiracy to defraud defendant, and both were on the witness stand, it is reasonable to suppose, that if plaintiff had acquired this information in a way which would not have shown an intimate relation between him and Manning, he would have shown it in his testimony. It is difficult to conclude that the plaintiff really wanted the wheat when he was at the board meeting on January 29, for he was then informed that the contracts could be filled with wheat there at Atwood, at prices from $1.90 to $2 per bushel, and the same could have been done on January 31, and on any day up to February 4. Appellant says that he was not compelled to go out and buy wheat by the wagon load. The evidence is not that he would have been compelled to buy it by the wagon load. The evidence was that the contracts could have been filled; that there was wheat in elevators and piled on the ground at Atwood, ample to fill these contracts and more. Plaintiff did not buy wheat to fill these contracts within forty eight hours. His first purchase was on February 12, and from that up to February 28. So the jury might well conclude that plaintiff was not wanting wheat so badly on January 29, as he was wanting a foundation for a claim for damages. Under this evidence the jury might reasonably find that there was some private understanding between the plaintiff and Manning, the exact nature of which neither of them was willing to disclose, but by the terms of which they sought to revive these old August contracts so as to make enforceable in January, and not so much for the purpose of getting wheat as for the purpose of laying the foundation for the claim for damages, which, of course, would be to the injury and wrong of the defendant.

The above sketch of the evidence is not uncontradicted in some details, but it is a view of the evidence which defendant might reasonably ask the jury to take, and with the issue of conspiracy raised by the pleadings, it is ample to support defendant's claim of conspiracy, and being so, it was proper for the court to instruct the jury on that question.

Naturally, there are many cases cited in the books, some in which the evidence of a conspiracy was held sufficient to go to the jury, and some in which it was held insufficient. We have examined all of those cited by counsel and many more. No good purpose could

be served by a detailed analysis of them. It is sufficient to say that under the evidence in this case and. the authorities above cited, there was ample evidence to go to the jury on this question.

Finding no error in the case, the judgment of. the court below is affirmed.