No. 31,041.

ELLA B. ADAMS, *Appellee*, v. RUDOLPH SNYDER et al., *Defendants;* HARRY B. STRAUSS, *Appellant.*

(20 P. 2d 827.)

Opinion filed April 8, 1933.

*A. J. Herrod* and *A. E. Margolin,* both of Kansas City, for the appellant; *Frederick R. White,* county attorney, of counsel.

*James M. Meek,* of Kansas City, for the appellee.

The opinion of the court was delivered by

JOHNSTON, C. J.: This was an action by Wyandotte county to foreclose a tax lien on real estate, which was subsequently consolidated with an action by Ella B. Adams, to foreclose a mortgage on the same real estate, as against Rudolph Snyder and others, including Harry B. Strauss, a purchaser of the property at a tax sale. Judgment was given in favor of Ella B. Adams, and the rights of the defendants were adjudicated. Harry B. Strauss, one of the defendants, alone appeals.

In the tax foreclosure proceeding brought by the county judgment was given on service by publication only, and Ella B. Adams, who owned a $7,000 mortgage on the property, intervened, asking

that the judgment be opened up and she be let in to defend. This application was granted by the court, and from that judgment defendants appealed.

The judgment of the court as to the right of Mrs. Adams to have the judgment opened up was rightly affirmed. (*Wyandotte County Comm'rs v. Axtell*, 134 Kan. 304, 5 P. 2d 1078.) While that action was pending Mrs. Adams brought an action to foreclose her mortgage against the makers of the note and mortgage as well as subsequent grantees, and Harry B. Strauss, the purchaser at the tax sale. Both of these actions were consolidated and tried, with the result stated. When Mrs. Adams intervened she deposited with the court $1,268.33 to cover the taxes and costs on the property in the tax proceeding. It appears that a mortgage was negotiated by S. J. Eisberg, the mortgage itself being executed by his son-in-law, Rudolph Snyder, and his wife. The mortgaged property had been in the possession of some member of the Eisberg family most of the time since 1913, and the ownership had shifted about from one to another of the relatives. S. J. Eisberg became the owner in 1913, and in September, 1920, conveyed it to his brother, S. N. Eisberg. In February, 1921, S. N. Eisberg conveyed the property to the Intercity Realty and Investment Company, of which S. J. Eisberg was president. In December, 1923, the investment company conveyed it to one Heimovics, and in the same month Heimovics executed a mortgage on the property for the sum of $3,000. On the date of that mortgage Rudolph Snyder, son-in-law of S. J. Eisberg, acquired the legal title to it, and within two months thereafter the $3,000 mortgage was assigned to S. J. Eisberg. Rudolph Snyder executed the mortgage in question to Mrs. Adams on July 14, 1925, and three days later S. J. Eisberg acknowledged satisfaction of the $3,000 mortgage. In June, 1928, Rudolph Snyder and wife conveyed the property to S. N. and M. J. Eisberg, brothers of S. J. Eisberg, subject to the encumbrances of record. As interest accrued on the mortgage to Mrs. Adams, she would notify S. J. Eisberg, and the interest payments were promptly made, except the one due when the principal sum became due; and when she informed S. J. Eisberg that the payment was due he requested an extension of the loan, but as Mrs. Adams needed the money she was unable to grant a renewal or extension of the loan. He then requested an abstract of title to the property, which Mrs. Adams had, in order to get a new loan from

another, but it had been left in the hands of her agent, W. T. Miles, who had recently died, and his wife, who had possession of his papers, was away on a vacation and would not return until about September first. S. J. Eisberg obtained the abstract about that time, when he informed Mrs. Adams that he had bad news for her— that the mortgaged property had been sold for taxes. She said to Mr. Eisberg, "You told me that you would keep the taxes paid," and he replied: "You cannot always tell what a son-in-law is do-ing, and I didn't know anything about it." This interview occurred in October, 1930. Upon investigation Mrs. Adams found that the tax suit had been commenced on April, 1930, and a judgment of foreclosure entered June 19, 1930, and an order of sale issued; that a sale had been held on August 11, and that Harry B. Strauss appeared to have been a bidder. It also was shown that S. J. Eisberg was a bidder, and that Mrs. Strauss, who was a sister of the wife of M. J. Eisberg, was a successful bidder and one of the record owners by conveyance from Snyder. She appears to have been bidding for her husband, and she testified that S. J. Eisberg was a bidder at the sheriff's sale. A sheriff's deed was issued to Harry B. Strauss on December 16, 1930, and was promptly re-corded. Immediately thereafter Mrs. Adams filed her application to have the tax judgment opened up and she be let in to defend. After the decision on that question in this court the consolidated actions were tried. After the deed by the sheriff to Harry B. Strauss, the legal title holders, M. J. Eisberg and S. N. Eisberg, con-veyed the property by quit-claim deed to Strauss. However, two months later these owners filed a motion in the tax case asking that the answer and cross petition of Mrs. Adams be stricken from the files.

The bid of Strauss at the tax sale was $1,700, which was $441.67 in excess of the taxes and charges due upon the property, and which was paid over to the sheriff. This excess was drawn down by M. J. Eisberg and S. N. Eisberg, holders of the legal title. It appears that Strauss paid the accruing taxes on the property after the sheriff's deed was executed to him.

On the testimony the court held that there was collusion among the defendants named, including Strauss, the purchaser at the tax sale, to defeat the mortgage right of Mrs. Adams; that Strauss did not acquire a title to the property by virtue of the tax deed, and

that he was not entitled to the return of any sum from the county by reason of his collusive purchase and the failure of title by reason of the purchase. It was adjudged that Mrs. Adams was entitled to receive the amount due on her note and mortgage, $8,280.33, and a decree of foreclosure of the mortgage was entered, it being decreed that if payment was not made within ten days an order of sale be issued and the property sold and from the proceeds thereof costs be paid, the judgment in favor of Mrs. Adams, and also that the amount advanced and deposited by her with the court when she intervened in the tax case be returned to her. It was further adjudged that Strauss have judgment against M. J. Eisberg and S. N. Eisberg, in the sum of $441.67, which was the excess of the bid of Strauss at the sale and which the Eisbergs drew down from the clerk of the court.

In her petition Mrs. Adams charged fraud and collusion against the defendants in an attempt to defeat her mortgage lien by allowing the taxes to remain unpaid on the property and thus acquire a title to the same free from the lien of her mortgage. The facts and circumstances of the case, some of which have been related, fairly well establish the charge of collusion and fraud.

Strauss contends that there was error in the judgment; the other defendants, although personally served with summons, did not appear in the case to make a defense. The principal contention of Strauss is that the charge of collusion and fraud was not shown by sufficient competent evidence.

The facts and circumstances already set forth strongly tend to show collusion clear down to the purchase at the tax sale. It was a family affair, and all appear to have coöperated to the same end, that is, to defeat the mortgage, but only Strauss had the hardihood to defend against the charge and the inculpating facts and circumstances alleged and shown. The different steps of action and inaction manifestly point to the same purpose, the defeat of plaintiff's mortgage, even to the care taken to have competition among themselves at the sale, thus giving it the appearance of innocence and validity. It is said that there is no direct evidence that defendants combined for the illegal purpose. Conspiracy to defraud cannot always be shown by direct evidence. Those engaged in a conspiracy to defraud rarely admit the common purpose, but in such cases circumstantial evidence suffices. When there is collusion, each of

the parties charged evincing a knowledge and approval of the acts of the others, all in furtherance of the conspiracy, proof of the separate acts of several persons may be shown, and it has been said:

"The greater the secrecy that is observed relative to the object of such concurrence, and the more apparent the similarity of the means employed to effect it, the stronger is the evidence of conspiracy." (5 R. C. L. 1104.)

In *Rickel v. Coöperative Exchange*, 113 Kan. 592, 215 Pac. 1015, it was said:

"It is well settled by the authorities that conspiracy, when charged either in a civil or a criminal case, may be proved by circumstantial evidence. It is proper to prove the charge by direct evidence, but as the direct evidence is ordinarily in the possession and control of the alleged conspirators, frequently the opposing party cannot obtain it. Hence, in actual practice, it is usually proved by circumstantial evidence, and where the charge is made its tendency is to open rather a wide field of inquiry." (p. 600.)

In *Hutson v. Imperial Royalties Co.*, 135 Kan. 718, 13 P. 2d 298, it was said:

"Because of the very nature and character of a conspiracy it is seldom possible to prove it by direct evidence, and it is nearly always necessary to establish it by circumstantial evidence, which is universally recognized as the proper means of proof." (p. 723.)

In this proceeding there was both action and inaction in the effort to carry out the wrongful purpose. In *Beneke v. Bankers Mortgage Co.*, 135 Kan. 444, 10 P. 2d 825, which involved a charge of conspiracy and fraud, it was said:

"It is true, as defendants say, mere conspiracy is not actionable. Harmful consequence of conduct pursuant to conspiracy is actionable. But silence and inaction in aid of fraud are conduct, as much as action and declaration to circumvent fraud are conduct. The fraud on the shareholder is admitted. There is no innocent holder of the original certificate. The company, in all fairness and good faith, owes it to the shareholder to do what it can to assist and to protect him, and collusion of the company's directors and managers to oppress the stockholder and keep him remediless in effect makes them and the company parties to the fraud." (p. 446.)

We think the evidence was sufficient to warrant the finding as to collusion among the defendants, and that by reason of the participation in it by Strauss, he did not acquire a title to the property by virtue of the sheriff's deed to him. An examination of the proceedings satisfies us that there was no error in permitting the intervention of plaintiff in the tax suit and in sustaining her lien as against the tax sale and deed. A number of cases are cited by appellant as

supporting the right of a purchaser at a tax sale, even if he is a relative of the defendant in the action. The principles announced in these authorities apply and are appropriate to innocent purchasers, but do not apply where the purchaser was a party to the conspiracy and fraud. The title holders of the property, as we have seen, conveyed it to Strauss and from then on the legal title was in Strauss, subject, of course, to tax liens and the mortgage lien of the plaintiff. It was a proper and just order made by the court that the money paid into the court by her as taxes and charges, $1,268.33, in order that she might intervene and set up and establish her right as a mortgagee, be returned to her. It was the duty of the owner to pay the taxes. The amount of the taxes has not been included in the judgment on the mortgage lien and could not be taken out of her judgment for the amount of her loan and lien. The contention by Strauss that he should have been allowed at least the taxes paid by him on the property subsequent to the sale and sheriff's deed is not good. It appears that he had procured and held the legal title to the property, with possession and the right of redemption within eighteen months and all the profits to be derived therefrom. All the plaintiff received is the enforcement of her lien on the property. It is for Strauss, the title holder, to discharge taxes and mortgage liens if he desires to clear his title or to avail himself of the right of redemption. It appears the court did give him a judgment for the excess of his bid and payment over the amount of taxes and charges due on the property and which was taken down and appropriated by the Eisbergs, his grantors.

An examination of the entire record satisfies us that no error was committed by the court in the judgment rendered, and it is therefore affirmed.