No. 35,881

THE STATE OF KANSAS, *Appellee,* v. NEIL ADDINGTON, *Appellant.*

(147 P. 2d 367)

Opinion filed March 27, 1944.

W. L. Cunningham, of Arkansas City, argued the cause, and D. Arthur Walker, William E. Cunningham, both of Arkansas City, and Jerome Sullivan, of Duncan, Okla., were on the briefs for the appellant.

George Templar, of Arkansas City, argued the cause, and A. B. Mitchell, attorney general, William P. Timmerman, assistant attorney general, C. H. Quier, county attorney, Frank G. Theis, assistant county attorney, and John A. Herlocker, of Winfield, were on the briefs for the appellee.

The opinion of the court was delivered by

SMITH, J.: In this action the defendant was convicted on three counts of obtaining money by false pretenses. He has appealed.

The prosecution was begun against the defendant and two others jointly. The various counts of the information charged that Addington, Souligny and Roach conspired to defraud one Hill by false representations with reference to the value of stock of the Marland Oil Company of Oklahoma. The Marland Oil Company had been organized by Marland before he became governor of Oklahoma. It was allowed to lie dormant while he was governor but after he left the governor's office the company became active again. Its headquarters was Ponca City, Okla. During the early months of 1940 several citizens of Arkansas City, Kan., called on Marland at Ponca City and invited him to move his company to that city. Following this invitation the company did open a branch office in Arkansas City. Addington was secretary-treasurer, Souligny vice-president and Roach was a stock salesman. They all three came to Arkansas City late in 1940. One of the inducements which led to the moving of the office to Arkansas City was the sale of stock to people in and around Arkansas City. Several people bought stock, among them being Hill, a dentist. These sales and the borrowing of $2,500 on one occasion are the basis of this prosecution.

Chronologically the acts upon which the third count is based took place first; those as to the first count second; and the second count third. They will be so treated in this opinion.

The third count alleged that the sale of 1,000 shares of stock in the Marland Oil Company was made to Hill on December 28, 1940; that the consideration paid by Hill was a note for $5,000 on which he paid $200 down at the time the sale was made and on which he made two monthly payments of $175 each. The misrepresentations charged were that the company had oil and gas leases in certain

named counties in Oklahoma and Kansas; that it had money on hand with which to develop these leases; that it was solvent and had no debts except small current expenses, and that it had $85,000 worth of stock paid in cash. It was charged that all these representations were false and that they were made by defendants knowing them to be false and were relied on by Hill when he made the purchases.

The first count was based on the sale of 1,000 shares of stock that took place about February 17, 1941. The false representations charged were about the same as those for the third count with the addition of a representation that the company had discovered an oil well in Butler county, Kansas, on a lease owned by it that was sufficiently large to permit the company to declare a fifty percent dividend within six months, and to cause the value of the shares of stock to double. It charged that Hill gave the company a note for $5,000 in payment for this stock and that he paid $1,000 on this note on February 17, 1941, and an additional $1,500 in March of the same year.

The second count alleged about May 1, 1941, defendants represented to Hill that the company had a lease in Rice county; that Al Derby had made a contract to drill a well on it; that he had moved a well-drilling outfit onto the property; had drilled to a depth of 750 feet and the well was going down fast with a rotary rig; that Derby had demanded the sum of $5,000 for completing the well and had told them he would move off the lease if it was not paid at once; that defendants had raised $2,500; that they needed $2,500 more. The count further charged that these representations were false and Hill relied on them and gave the company his note for $2,500. There was no sale of stock involved in this transaction.

Souligny and Roach each asked and were granted a severance. The state elected to try Addington first. The first witness for the state was Hill. During the course of his testimony he testified as to the purchase of stock on February 17, 1941. At this point the state broke into his testimony and called Souligny to the stand. His counsel objected to his giving any testimony because he was charged jointly with Addington and to compel him to testify would be in violation of his constitutional rights. Counsel for the prosecution stated that the state desired to have him produce the note and contract that was signed by Hill for the purchase of February 17, 1941. Upon this statement the court overruled the objection. Thereupon the witness proceeded to testify that there was no note or contract

signed at the time of the sale of stock, about which inquiry was made. This witness was then excused and the examination of Hill resumed. Subsequently during the presentation of the state's case the defendant asked that the matter of Roach testifying be taken up in the judge's chambers out of the presence of the jury. The court denied this request. Roach was called to the stand and before he was asked a question his attorney objected to his being required to testify. The court sustained this objection. Defendant then asked the trial court to instruct the jury not to consider this. This request was refused. During final argument of the case counsel for the state referred to Roach's refusing to testify by saying:

"Lloyd Roach is jointly charged here with this defendant. We subpoenaed him and put him on the witness stand. You remember that. We started to interrogate him. He wouldn't testify. Why? Because his counsel stated his answers might tend to incriminate him. Incriminate him of what? Of this offense, I assume. . I suppose that counsel will say to you, for the defense, that it was Lloyd Roach who did all these things. He was just a stock salesman."

Defendant objected to counsel's making any comment on the failure of Roach to testify. This objection was overruled. Defendant then asked the court to instruct the jury not to consider the above argument of counsel for the state. This request was denied. These rulings were all attacked by proper motions and the court's ruling on them is the first question argued by defendant here.

With customary thoroughness counsel for the defendant has marshaled authorities to the effect that it was error for the trial court to permit counsel for the state to comment on the fact that a codefendant of the person on trial refused to testify.

As to Souligny, the matters about which he testified had to do with some papers that were believed to have come into his hands as an officer of the corporation. A codefendant of the person on trial in a criminal prosecution may be compelled to testify as to corporate records that come into his hands as an officer of the corporation. See *U. S. v. Austin Bagley Corp.*, 31 F. 2d 229, and cases cited. There is another reason why it was not error to require Souligny to testify in this action. The answers he made to the questions asked were favorable to the defendant's theory. The state had the idea that it was necessary for it to produce the contract and note Hill said he signed when he made the purchase of February 17. Souligny was put on the stand for this purpose. He denied that there was any contract or note. Counsel for defendant uses this answer to argue here that there was a fatal variance between the charge in

the first count and the proof. Under such circumstances it cannot be said that Addington was prejudiced by Souligny's being compelled to testify.

As to the argument that the trial court erred in its various rulings with reference to the calling of Roach to the stand, the situation is not quite the same. We have dealt with the question, however. In *State v. Jones,* 137 Kan. 273, 20 P. 2d 514, a father and two sons were charged jointly with murder. On the trial of the father counsel for the state in his argument made reference to the fact that a codefendant did not testify. On appeal we said:

"In the thirteenth specification, complaint is made that the state's attorney made reference to the fact that Neil Jones, a codefendant did not testify. This is not error. Under the provisions of R. S. 62-1420, he was not incompetent, he was not on trial in the present action, and is not included in the provision—

"'That the neglect or refusal of the person on trial to testify . . . shall not raise any presumption of guilt, nor shall that circumstance be referred to by any attorney prosecuting in the case . . .' (See 16 C. J. 906.)" (p. 279.)

The immunity is based on the provisions of G. S. 1935, 62-1420, and section 10 of the bill of rights. G. S. 1935, 62-1420, provides as follows:

"No person shall be rendered incompetent to testify in criminal causes by reason of his being the person injured or defrauded, or intended to be injured or defrauded, or that would be entitled to satisfaction for the injury, or is liable to pay the costs of the prosecution; or by reason of his being the person on trial or examination; or by reason of being the husband or wife of the accused; but any such facts may be shown for the purpose of affecting his or her credibility: *Provided,* That no person on trial or examination, nor wife or husband of such person, shall be required to testify except as a witness on behalf of the person on trial or examination: *And further provided,* That the neglect or refusal of the person on trial to testify, or of a wife to testify in behalf of her husband, shall not raise any presumption of guilt, nor shall that circumstance be referred to by any attorney prosecuting in the case, nor shall the same be considered by the court or jury before whom the trial takes place."

Section 10 of the bill of rights provides, in part, as follows: "No person shall be a witness against himself."

At the outset it should be noted that this immunity is for the benefit of the party claiming it, not some third person. The reason Roach was not compelled to testify was the effect it would have on him, not what it would have on Addington. He was a competent witness. Indeed for all this record discloses he could have been compelled to answer whatever questions counsel for the state saw fit to ask him. We have no way of telling whether what the state

sought to bring out by questioning him would have incriminated him. The objection was sustained before any questions were asked. The rule is stated in 3 Wharton's Criminal Evidence, 11th ed., 1973, as follows:

"Generally, the question whether testimony is privileged is for the determination of the court. At least, it is not enough for the witness to say that the answer will incriminate him, as he is not the sole judge of his liability. The danger of self-incrimination must appear reasonable and real to the court, from all the circumstances and from the whole case, as well as from his general conception of the relations of the witness."

See, also, *People v. Plyer*, 121 Cal. 160, 53 Pac. 553.

There is no provision in the constitution forbidding comment by the state on the failure of the defendant to testify. The only provision on that subject at all is in G. S. 1935, 62-1420. That section has been already set out in this opinion, but attention is called to the fact that the statute provides that neither the failure of the defendant or of his wife to testify shall be referred to by any attorney presenting the action. It does not deal with the subject of the refusal of a person other than the defendant or his wife to testify. This subject received the attention of the territorial legislature when chapter 129 of the Territorial Statutes of 1855 was enacted. Section 22 of article 6 of that chapter provided that the person injured or liable to pay the costs of the prosecution should be competent to testify in a criminal prosecution. Chapter 9, article 9, section 4, of the Territorial Statutes for 1858 added to these persons "accomplices when they consent to testify." Chapter 27, section 194, of the Territorial Statutes for 1859 dropped the foregoing provision. This section was reënacted by section 215 of chapter 82 of the Laws of 1868. It will be noted that all of the above enactments simply provided that persons with an interest should be competent witnesses. Chapter 118, section 1, of the Laws of 1871 reënacted the provisions of section 215 of the Laws of 1868 and amended that section by adding a provision against the wife or husband of a defendant being required to testify, except as a witness for the defense, and the provision that the refusal of the wife or husband to testify should not raise any presumption of guilt or be commented on by the prosecuting attorney. This section is G. S. 1935, 62-1420. It has been unchanged through the years. The immunity of a codefendant from being compelled to testify is based on the constitutional provision that has been noted. In the case of *In re Nickell,*

*Petitioner,* 47 Kan. 734, we quoted and followed *Counselman v. Hitchcock,* 142 U. S. 547, 35 L. Ed. 1110, where it was said:

"'It is impossible that the meaning of the constitutional provision could only be, that a person should not be compelled to be a witness in a criminal prosecution against himself. The object was to insure that a person should not be compelled, when acting as a witness in an investigation, to give testimony which might tend to show that he himself had committed a crime. The privilege is limited to criminal matters, but it is as broad as the mischief against which it seeks to guard.'"

The rule that a codefendant cannot be compelled to testify if his answers would incriminate him follows from the above. All this is interesting because there is no legislative or constitutional provision that counsel for the prosecution may not refer to the fact that a codefendant did not testify. There are some authorities holding that such comment may not be made. We prefer, however, to adhere to the rule announced in *State v. Jones,* supra, that to permit the making of such comment is not error. See, also, *State v. Madden,* 170 Ia. 230, 148 N. W. 995; *Arensman v. State,* 79 Tex. Crim. Rep. 546, 187 S. W. 471; *State v. Hogan,* 115 Ia. 455, 88 N. W. 1075; *Davis v. Commonwealth,* 191 Ky. 242, 229 S. W. 1030 and *State v. Greer,* 321 Mo. 589, 12 S. W. 87.

There is another reason why the judgment should not be reversed on account of the action of the trial court in permitting this reference to be made. We have examined the entire record, including the remarks of counsel. It does not appear that what was said by counsel was prejudicial to the defendant or any substantial right was affected. Under such circumstances the judgment will not be disturbed on appeal. See G. S. 1935, 62-1718; *State v. Peterson,* 102 Kan. 900, and *State v. Brooks,* 72 Kan. 175, 85 Pac. 1013.

The defendant next argues that there was a failure of proof of the representations of defendant which the state claimed were false. The approach of the defendant to this question is twofold. He argues first, that the information charged a representation that the company owned certain leases, while the evidence was simply that it did not own these leases of record. In the second place, he argues that the complaining witness merely testified that he made a search of the records in various counties and failed to find any leases on record in the name of this company. Defendant argues that this evidence was not sufficient to prove that the company did not actually have these leases. There is much to be said on both sides of this question. There is no necessity for dealing with it here,

however. Even if there had been a complete failure of proof as to these leases, there was still ample evidence of representations that the company was solvent; that it had $85,000 worth of stock paid in cash; that it had sufficient money to drill on these leases; and that these representations were false. It was not necessary to sustain a conviction to prove all the representations charged were made or that they were all false. (*State v. Hetrick,* 84 Kan. 157, 113 Pac. 383, and *State v. Beezley,* 119 Kan. 300, 239 Pac. 998.)

Defendant next argues that the trial court committed error when it permitted evidence of statements of Roach and Souligny to be introduced. He argues that these two parties were charged jointly with defendant, and before the statements of this witness, a codefendant with Addington, could be introduced it must have appeared that there actually was a conspiracy between Addington and the witness. He argues that there was no such proof here. The matter of whether there was a conspiracy between Addington, Souligny and Roach could be proved like any other disputed fact by circumstantial evidence. On that account no particular order may be required. See *State v. Miller,* 35 Kan. 328; *Hutson v. Imperial Royalties Company,* 135 Kan. 718; *Drysdale v. Wetz,* 102 Kan. 680, 171 Pac. 653; *Rickel v. Coöperative Exchange,* 113 Kan. 592, 215 Pac. 1015; *Baugh v. U. S.,* 27 F. 2d 257; *Commonwealth v. Dyer,* 243 Mass. 472, 138 N. E. 296. In this case Addington, Souligny and Roach came to Arkansas City together, each held offices in the oil company, the instrumentality of the fraud. As far as the outside appearances were concerned they were all engaged in promoting the sale of what they must have known was worthless stock. Hill first met Roach, the stock salesman. He invited Hill to meet Addington and Souligny, the officers of the company. Their offices were adjoining. There were maps on the walls with pins stuck in them to show the location of leases. Hill had conversations with all three of these men, together and singly, many times about the purchase of stock and the condition of the company and the value of the stock. Roach at Addington's request showed Hill what he claimed was a Marland well and said, "It is our well." Again at Addington's request Roach showed him a well at Tonkawa. Following that were false representations that led to the signing of the contract of February 17. These and other circumstances, too numerous to mention here, constitute substantial evidence that all of these parties were acting in concert and were conspiring to cheat Hill by misrepresenting the

value of this stock. Defendant points out that evidence was admitted of some statements of the codefendants made after the last sale of stock. He argues that this was error under the rule that statements made by coconspirators after the conspiracy has ended are not admissible. That rule does not apply here because the statements to which the defendant has reference were quite evidently made as part of a plan to lull Hill into a sense of false security after he had been cheated.

Defendant next argues that there was a fatal variance between the charge in the second count and the evidence to support the charge. It will be remembered that in this count it was charged that the defendants conspired to cheat Hill by pretending that the company had a good lease on a tract of land in Rice county and that the company had made a contract with Al Derby for the drilling of a well on this lease and that pursuant to that contract Derby had moved a well-drilling outfit onto the lease and had drilled to a depth of about 750 feet; that Derby had demanded $5,000 to pay for completing the well; that the three defendants had raised $2,500 and they needed $2,500 more to pay Al Derby to complete the contract. This count did not charge that Hill bought stock. It charged that he gave a note for $2,500 to the company, secured by a real-estate mortgage. Defendant points out that in support of this charge, amongst other things, Hill testified that the defendants told him that this well would be so good that he could be paid back out of the money the company would receive from the oil run. He argues that this was a promise of something to be done in the future, and not a representation of a present existing fact such as is necessary to sustain the charge of obtaining money under false pretenses. Not all the representations made by defendant to cause Hill to make this note were promises of something to be done in the future. The statement that a contract had been made with Derby that a well was being drilled with a slim hole portable rotary rig and that the well was down 1,000 feet were statements of present facts. They were false and were relied on by Hill. The proof of the foregoing was sufficient to sustain the charge even though there were some statements of things to be done in the future made at the same time. See *In re Snyder,* 17 Kan. 542; also *State v. Briggs,* 74 Kan. 377, 86 Pac. 447. Furthermore, it was a question for the jury whether the statements of things to be done in the future as to this count were made with the knowledge and intention of the defendant that they would not and

could not be done. Naturally the $2,500 could not be paid out of the proceeds of the well if the well was never drilled. At the time the note was obtained from Hill no contract had been made with Derby, no drilling with an oil-drilling rig had been started, and no well was ever drilled.

Defendant next argues that there was a fatal variance between the charge in the first count of the information and the evidence. He points out that this count charged that Addington, Souligny and Roach obtained by false pretense a note for $5,000 from Hill given in payment of 1,000 shares of stock. He argues that the state undertook to prove this charge by the testimony of Souligny and that he denied that any such note was given. The above statement of the charge is not quite complete. It did charge that the three defendants obtained a note for $5,000 from Hill, but it also charged that they obtained from him two payments on this note, one for $1,000 and one for $1,500. Hill testified that he signed a contract for the stock, with a note for $5,000 attached. There is no denial that the payments of $1,000 and $1,500 were made. If the jury believed Hill's testimony that a note was given and a contract signed by Hill, this was sufficient to sustain the conviction on this count. (See *State v. Holmes*, 98 Kan. 174, 157 Pac. 412.)

The defendant next argues that the trial court erred in admitting evidence of a privileged communication. This has to do with the testimony of Earle N. Wright, an attorney. The transcript of this testimony given at the preliminary examination was offered. At the time of the trial this witness was in the armed forces and not available. At the preliminary this witness testified—

"I acted as the company's attorney in a good many matters. Examining abstracts, drawing contracts, drilling contracts and assignments, and whatever they called upon me to draw, that is different papers. My work for the company commenced about October, 1940, and continued up until about May, 1941. During the time I worked for the company I had a good many conversations with these parties about the company's affairs."

When the transcript was offered at the trial defendant objected to it because it was a privileged communication. The trial court then stated the objection to so much of the testimony as was based upon information covered by Wright as a stockholder and as one sought out by the company to invest money would be overruled and as to certain other portions would be sustained. The trial court went through the transcript and indicated the portions of it which should not be admitted. The transcript was then read to the jury minus

the portions to which the court had indicated an objection would be sustained. Not every communication to a lawyer by a client is incompetent. It must be of a confidential nature and made to the party in his capacity as a lawyer. See *Moran v. Thurman*, 127 Kan. 688, 275 Pac. 160; also *In re Elliott*, 73 Kan. 151, 84 Pac. 750. Wright had testified that his employment was not general, but specific. Much about which he testified was as to information he gained and statements made to him by defendant to induce him to invest some money in the company. None of the matters about which he testified were facts about which he had learned as attorney for any of the parties or of the company.

Defendant next argues that the court erred in admitting certain documents in evidence. These exhibits were certain reports that had been made by the company to the state corporation commission in order to obtain a permit to sell stock in Kansas. The point made by defendant is that these reports were prepared by an accountant who was employed by the company, not by defendant. All of these reports were sworn to by defendant except one exhibit which was prepared from information furnished by him. They were competent as admissions by him as to the true condition of the company and his knowledge of it. Furthermore, he testified with reference to them that they reflected the true condition of the company.

Defendant next argues that the trial court committed error in striking out certain evidence of Souligny. When Souligny was on the stand the following occurred:

"Q. When was the next time you saw or talked to Dr. Hill? A. I believe it was the next day. I never seen him. I might have seen him, but I don't believe I talked with him until the day he made a loan from Mr. Heard to pay the balance of his subscription in the office—

"Mr. Templar: We object to the last part of the answer and move to have it stricken from the record and the jury be instructed to disregard it.

"By the Court: The objection will be sustained as to the last part of the answer about paying the balance of the subscription and the jury is admonished not to consider it."

Defendant argues that he should have been permitted to show that the note Hill gave for $2,500 on May 2, 1941, was to pay the balance of his purchase of February 17, 1941, rather than for the purpose for which Hill had testified it was given. Be that as it may, a little later in his testimony Souligny testified as follows:

"Q. Probably about the second of May. Did you have a conversation with him at that time? A. Yes, I think I met him and shook hands with him and

told him this, that I was glad he had been able to raise that money and get it in on his subscription, as we were needing it at that time."

So it is clear that Souligny finally got this bit of evidence into the record.

No error appears in this record and the judgment of the trial court is affirmed.

PARKER, J., not participating.