FRED KOCH et al., Appellees, v. KIRON STATE BANK et al., Appellants.

No. 44736.

April 8, 1941.

Rehearing Denied September 26, 1941.

Powers & Gilchrist, for appellees.

E. A. Norelius and William Welch, for appellants.

BLISS, J.—An opinion was rendered in this case on January 9, 1940, and reported in 289 N. W. 447, which reversed the decree of the trial court. A rehearing was granted on petition of the appellees, and upon resubmission it is our judgment that the trial court was right and that its decree should be affirmed. Our first opinion, noted above, is, therefore, set aside and this opinion is substituted in its stead.

Plaintiffs' petition was filed on February 19, 1938. By pleading and proof it appears without dispute that: In 1922 the parents of plaintiffs, for $1.00 and love and affection, deeded to their son, Chris Koch, a quarter-section farm, subject to annual payments during the lives of the grantors, and subject to aggregate payments of $12,000 to be made to plaintiffs within one year after the death of the surviving grantor; these payments were liens upon the land; Chris was a patron of and a borrower from the defendant bank, and in November 1931 he renewed his notes for $4,100, and gave separate mortgages on the land and on livestock, implements, and crops securing his indebtedness; he did not pay the taxes on the land for 1931 or any subsequent year; on February 4, 1935, J. W. Miller, Jr., bought the land at tax sale; the bank had constructive notice by record, and actual knowledge, of plaintiffs' liens; the bank paid taxes for its patrons; subscribed for a service giving it tax sale reports; it kept track of whether the taxes were paid on this land, and received the delinquent tax list each year, and knew it was listed as being up for tax sale; when the list was published, it was looked over to see what items the bank might be interested in; it knew of the stipulations in the deed to Chris, and realized its real-estate mortgage was of little value as security, and that it had no equity in the land, and that it was impossible for Koch to refinance the farm under the liens against it; the father of Chris died in 1929 and the mother in 1937.

The trial was had on June 13, 1938. The defendants did not use any witnesses. . Chris, used by plaintiffs as a witness, testified that: He had paid no taxes since 1930; that "he kind of thought it was sold for taxes, but did not know who bought it," until Miller served the redemption notice on him in the fall of 1937 that he was about to get a tax deed; he then went to see Miller, who told him he had bought the farm, and asked him if he had some money to pay the taxes, and he told Miller that he had none; a while afterward, he went to the defendant bank and told them the farm was sold for taxes. Miller testified that he and his brother were out of pocket about $1,200 in the matter of the tax sale transaction; that when he found the certificate was ready for deed, he wrote Chris to come and see him, which he did; that he told him to make arrangements for redemption, as he didn't want the land, and that he (Chris) should go and see his banker; that before he received the tax deed, Dahl, the cashier of the defendant bank, came to see him, and he told Dahl that he didn't want the farm and was going to sell it and wanted $1,600; that the price was later reduced to $1,500, and Dahl asked him to put the agreement in writing, which he refused, but he told Dahl that the first person who put $1,500 on the line after the tax deed was issued was going to buy the farm. He further testified that:

"We [his brother and he] didn't want to be mixed up in any litigation. I didn't know whether there would be any. We expected to make a little profit."

Respecting the reduction of the price from $1,600 to $1,500, Miller testified:

"Q. But you gave him [Dahl] to understand if it wasn't redeemed he could have it at your price for $1,600, and they finally talked you down? A. It was talked that way.

"Q. But you later reduced it to fifteen? A. He offered us fifteen and we took it."

If Miller was not then driving a bargain with the bank, instead, as the appellant insists, of being ready to deal with anyone, why did he reduce his price $100 without waiting for a better bid? And why was the bank interested in having the

price reduced $100 unless it, instead of some other purchaser, was going to get the benefit of the reduction?

Mr. Dahl testified that: Early in the year 1938, in January or February, sometime before the tax deed issued, he talked with Miller about this land; when he came down there Miller said that after he received title, he didn't care particularly to own the land, and if he could get his price for it he would sell it; he put the price at $1,500; he didn't state exactly that if the bank would give him a profit of around $300 in excess of the taxes, after he got the deed, he would deed it to us; the bank knew the land was worth a great deal more than that; the farm would be worth $60 or $65 an acre. In answer to questions, Mr. Dahl testified:

"Q. So that you expected him to sell it to you for $1,500 when he got the deed? A. Well, yes. Of course he didn't say he would hold it for us, but that is what we expected to pay.

"Q. You relied on his word he would let you have it for $1,500? A. That was his price, yes. We had no agreement with him *in writing* and I do not know of any one that did have an agreement in writing with Mr. Miller. * * *

"Q. Well, you indicated to him that you would buy it when he got it, didn't you? A. Well, naturally we were interested in it."

He further testified that after talking with Miller *"we* consulted Mr. Everett Norelius; he handled the case for us." Just who, besides Dahl, was included in the word "we," used by him repeatedly, does not appear. We do not have the benefit of his testimony. The consultation with the bank's attorney, Mr. Norelius, was not later than February 4, 1938, because on that date the bank executed a release of the Chris Koch real-estate mortgage acknowledging full payment and satisfaction. Of that transaction, Mr. Dahl testified:

"I looked after the satisfaction of the Chris Koch mortgage. It was executed and filed on the strength of our attorney's recommendation. *He told us we would be in a better position to take title from Miller if the mortgage was satisfied and that is the reason we did it.* We did not feel that we had any-

thing to lose by filing the satisfaction. We felt the mortgage didn't amount to anything. Realizing the lien against it, we felt that there was no object in paying taxes, throwing good money after bad."

The reasoning is sound. Releasing the mortgage would lose them nothing, and *might* pay them handsomely.

On February 10, 1938, the bank gave a check for $1,500 payable to Mr. Norelius. On February 11, 1938, the release of the Koch mortgage was filed for record. The tax deed had not yet issued, but, notwithstanding, Miller's price was delivered to Mr. Norelius, and the bank's mortgage was irrevocably released. It is quite convincing proof that a definite agreement had been previously made between the bank and Miller that he was to get the tax deed and then convey to the bank on receiving the $1,500. It was important that the mortgage release be recorded before the deed from Miller was delivered to the bank, so that it could be said that the bank was not then a junior lienholder. The tax deed was issued on February 14, 1938, and on the following day Miller conveyed the land to the bank, and received the $1,500 check.

Mr. Dahl testified:

"Naturally we were expecting trouble. We felt there was a contest in the case and we really didn't know what grounds we had.

"Q. But you knew it was questionable whether you could hold title after you got it? A. We realized it was a cloud in the title."

The bank was fully aware of what it was attempting to do, and of the way which they thought would place them in *a better* position. It knew that it was their right and their duty to make redemption from the Miller tax sale, and thus save what security there was for all the lienholders. It would have taken no chances in making redemption for it would have had a first lien for any sum so expended. But, it wished to "better its position" by making its entire indebtedness a first lien, by cutting out the plaintiffs' prior liens. It had not surrendered its notes when it released the real estate mortgage. All it was looking for was

better security. And that is all that it is in fact claiming now. As Mr. Dahl testified:

"Banks are not buying tax titles. * * *

"Q. All you wanted was your money he owed you? A. That was the first consideration, yes sir. * * *

"Q. But you would have deeded it back to Chris, wouldn't you, if your indebtedness was paid? A. Well, naturally, we are not aiming to keep any real estate we might acquire. * * *

"Q. You didn't feel that Chris Koch had any peculiar or special claim on this land after your debt was paid? A. Well, as I just said, we were concerned about our—the money we had advanced and we wanted to recover it, naturally. * * * We expected that *subject to some legal difficulties that had already been pointed out to us,* if we got title we would at least have security for Chris' debt. * * *

"Q. In any event you are not scalping farms; if you get your money, that is all you want isn't it? A. That is our first consideration. However, I am not speaking for the board on that. *We* thought it was a good way to get our indebtedness a little better secured and I regarded it as security primarily."

The bank, by this interpretation of the transaction indicates that if Chris should pay his indebtedness to the bank, it would release its security therefor by deeding the farm to Chris, thus indirectly effecting what the law condemns, to wit, permitting a junior mortgagee to acquire a tax title and thus defeat prior liens upon the land. There was never any discussion between the bank and Miller as to the value of the land, or of its bearing upon the amount paid to Miller.

In brief, the plaintiffs in their petition allege that the bank in order to avoid making redemption from the tax sale wrongfully agreed and conspired with Miller that the latter would proceed to get a tax deed and then convey the land to the bank for the consideration. They also allege that the bank agreed with Chris that after it had received title and his debt to it had been paid, it would convey the land to him. They tendered to the bank whatever sum the court should deem equitable to reimburse the bank for expenditures made by it resulting in the discharge of tax liens. They prayed that Chris Koch be

adjudged the equitable owner in fee simple of the land, subject to a lien in favor of the bank for the expenditures just noted, and that subject only thereto the plaintiffs are the owners of valid liens as alleged, prior and paramount to any liens, right, title or interest of the defendants in and to the land.

The defendants deny the agreements alleged and aver that the bank released its mortgage because it had no value and then purchased the land of Miller after plaintiffs' liens were cut off by the tax deed. The bank prays that its title to the land be quieted. Plaintiffs reply that the release of the mortgage was not in good faith but was part of the collusion between Miller and the defendants, and for the fraudulent purpose of destroying of record the mortgage interest of the bank in the land.

The trial court, in its opinion, reviewed the evidence fairly and made findings of fact clearly supported by the record, sustaining the contentions of the plaintiffs. We have carefully reviewed the record and agree fully with the able trial court. The court rendered judgment and decree as prayed by plaintiffs, fixed the amount to be paid by plaintiffs to the bank for reimbursement at $1,143.50, together with interest at six percent from February 15, 1938. The court also decreed that the tax deed to Miller and the deed from Miller to the bank, and the assignment of the tax certificates of J. J. Miller (a brother of J. W. Miller, Jr.) to the bank are each null and void and of no force and effect, and are canceled, and the defendants and anyone holding under them are barred and estopped from asserting any rights thereunder, adverse to the liens of plaintiffs.

I. In the concluding page of their resubmission brief and argument, the appellants, after stating that the appellees had failed to state or to prove a case, give their reasons for reversal as follows:

"(1) Because the defendant bank was not a lien-holder at the time it secured a deed from one who had acquired a perfect title by a tax deed. (2) Because under the decision in the Wood v. Schwartz case, (212 Iowa 462, 236 N. W. 491), where the lienholder does not purchase at the tax sale, or furnish the money with which to purchase the property at said sale, or does not secure the assignment of the tax certificate prior to the issuance of the tax deed, and where no attack is

made upon the tax deed as issued, the former lienholder may purchase and secure a new and indefeasible title from the tax deed holder, free and clear of all liens. (3) Because plaintiffs have failed to bring themselves within the provisions of Section 7290 (Code of Iowa) wherein it is required that before a tax deed may be attacked, it must be shown that the claimants were the owners of the real estate at the time of the sale.''

Before these propositions may be intelligently analyzed, a discussion of the principles of law and of the authorities touching the right of a junior mortgagee or lienholder to acquire a tax title to the common security, adverse to, or destructive of, the rights of prior and superior lienholders, may be helpful. This court, in 1875, passed upon the question in Fair v. Brown, 40 Iowa 209. In that case, the plaintiff as the holder of a mortgage was given a decree of foreclosure subject to certain prior judgments held by the defendant, Weiser. The latter also held a junior mortgage, and a tax deed to all but 40 acres of the land covered by plaintiff's mortgage, which he had obtained through his own purchase at the tax sale, and at a time when he held his judgments and mortgage. In holding that the lien of plaintiff's mortgage was not divested by the tax title, 40 Iowa 209, 210, the court said:

''The question presented for our determination is this: May one incumbrancer defeat the lien of another by acquiring a tax title upon the land bound by the lien of each?

''A mortgagor, or one claiming title under him, cannot defeat the lien of the mortgagee by acquiring a tax title upon the land. Porter v. Lafferty, 33 Iowa, 254; Stears, administrator, v. Hollenbeck, 38 Iowa, 550. The rule, in these cases, is based upon the obligation of the mortgagor, or the party claiming under him, to pay the taxes; therefore, the act of the party acquiring title through his own default, is held to be fraudulent. In the case before us no such obligation rested upon defendant, for he was simply a lien holder and was bound neither by the law nor contract to pay the taxes which were the foundation of his tax title.

''But in another view his act is fraudulent against the plaintiff and the mortgagor. The land is a common fund for

the payment of plaintiff's mortgage and defendant's liens. Defendant was authorized to redeem from the tax sale. Rice v. Nelson, 27 Iowa, 148. Equity will not permit him to acquire the title for an inconsiderable sum when he was authorized to remove the trifling incumbrance by redemption. Though not bound to pay the tax, yet it was his right to do so to protect his own liens. He cannot obtain that protection by pursuing a course that will deprive the mortgagee of his security and leave the mortgagor to sustain the weight of the liens, which are personal judgments, after being deprived of his property by tax title. Equity will relieve against such oppression, and teach the grasping creditor moderation in his demands, and that he cannot destroy others to build up his own fortunes.''

The decision has been quite widely cited and approved by this court, and by courts and authorities elsewhere.

In Garrettson v. Scofield, 44 Iowa 35, the plaintiff foreclosed a first mortgage. The defendant held a junior mortgage and also a tax certificate issued to him for the nonpayment of taxes prior to both mortgages. In the decree foreclosing plaintiff's mortgage, priority was given defendant for certain expenditures due under his tax certificate. One item of expense omitted was for the statutory penalties. In holding defendant was not entitled to these penalties, 44 Iowa 35, 37, this court said:

''The defendant, Scofield, and the plaintiff were both mortgagees, and both claiming interests in the land to the extent of their respective mortgages, *and while it is true there was no absolute duty resting upon either to pay the taxes, yet they had such an interest in the land as to make it necessary to do so in order to properly protect the title.* Under these circumstances we do not believe that payment of the taxes by either at tax sale should entitle him to the statute penalties. See Fair v. Brown, 40 Iowa 209. * * * *At least both were the holders of liens and the payment of taxes was necessary to protect the title.''* (Italics are ours.)

In Austin v. Barrett, 44 Iowa 488, 491, the controversy was between tenants in common, and the grantee of another tenant in common claiming the entire property. The court said:

"Neither is it always true, that, to prohibit a party from obtaining a valid tax-title, he must be charged with an absolute duty or obligation to pay the taxes." (Citing the Fair and Garrettson cases.)

In Lane v. Wright, 121 Iowa 376, 377, 96 N. W. 902, 903, 100 Am. St. Rep. 362, a quieting title action, it appears that plaintiff held a senior judgment lien, and defendant, Wright, held a junior judgment lien. The latter bid in the land at his own execution sale. Plaintiff did likewise a year later at his execution sale, and took a sheriff's deed thereafter. Wright did not take a sheriff's deed but procured the assignment of a tax certificate issued to a stranger prior to the sheriff's deeds. He then quitclaimed to a third party defendant. Plaintiff brought this action to quiet title as against the tax title. In reversing a decree for defendants, this court said:

"The point made, and one which we think decisive of this appeal, is that Wright, as the holder of a lien upon the land, and of a sheriff's certificate of a sale thereof, cannot be allowed to defeat the senior lien by obtaining a tax deed, *and that in equity his purchase of the certificate of tax sale must be considered and treated as a redemption. We regard it as a well-settled proposition under the decisions of this court that, where several persons hold claims which are liens upon the same land, equity will not permit one of the lienholders to absorb the common fund by purchasing the land at tax sale.*" Cited in support are Fair v. Brown, supra, Garrettson v. Scofield, supra, Eck v. Swennumson, 73 Iowa 423, 35 N. W. 503, 5 Am. St. Rep. 690, with a notation to see also Manning v. Bonard, 87 Iowa 648, 54 N. W. 459 and Cowdry v. Cuthbert, 71 Iowa 733, 29 N. W. 798.

Continuing, 121 Iowa 376, 379, 96 N. W. 902, 903, 100 Am. St. Rep. 362, the court states:

"In each one of the cited cases there was no legal obligation to pay the taxes resting upon the party asserting the tax title, but in each it was held *that a person having the right to redeem from tax sale cannot,* by refusing or neglecting to exercise that right and becoming a purchaser at the sale, extinguish the liens held by others upon the property so obtained. * * * The principle which involves the rule denying the right of one

lienholder to obtain a tax title to the disadvantage of others *in similar relation to the common security* seems to be that, as the law gives each of them the right to protect the security by making a redemption, and gives the redemptioner a preferred lien to the extent of his disbursement for that purpose, *it would be inequitable to permit him to waive such right and become a purchaser at the sale, and thus, by an expenditure not greater than would have been required to pay the tax, exclude his fellow lienholders from all participation in the common fund.* The proposition seems to be entirely just, while the opposite rule would often bring about manifestly inequitable results.'' (Italics ours.)

In Eck v. Swennumson, supra, S. Swennumson foreclosed a first mortgage and assigned the judgment to plaintiff who purchased the premises at the execution sale and received a sheriff's deed. Prior to procuring his decree of foreclosure Swennumson bought the property at tax sale and assigned the certificate to J. J. Swennumson, who received tax deed, and conveyed to defendant. This action was to set aside the tax deed. In affirming the decree for plaintiff, 73 Iowa 423, 424, 35 N. W. 503, 504, 5 Am. St. Rep. 690, this court said:

''One of the grounds upon which plaintiff demands relief against the tax deed is that, as Swennumson *had the right to pay the taxes* for the protection of his security, his purchase at the tax sale should be regarded merely as a payment of them, made for that purpose, and consequently neither he, nor any person holding under him, could acquire title under the certificates; and we think this position should be sustained. * * * [Citing Fair and Garrettson cases] The ground of the holding is that, as the party *had the right to pay the taxes for the protection of his security,* it would be inequitable to permit him to acquire title by purchasing the property for the delinquent taxes, and thereby defeat the lien of the senior mortgage, and cast upon the mortgagor the weight of both his own and the senior lien.'' (Italics ours.)

In Cowdry v. Cuthbert, 71 Iowa 733, 734, 29 N. W. 798, plaintiff had sold land to defendant under contract to execute deed when the purchase price was paid. Defendant went into

possession. Previous to his purchase, the land had been sold for taxes which culminated in a tax deed issued to one Simmons, subsequent to defendant's purchase. He had notified plaintiff to make redemption, which she failed to do. Simmons, the holder of the tax title, then conveyed to defendant, and the latter refused to make further payments under his contract of purchase from plaintiff. Plaintiff brought suit to have the tax deed declared void, and the relief was granted. In affirming, this court said:

"Under the contract the plaintiff and Cuthbert occupied the position of vendor and vendee. The former held the legal, and the latter the equitable, title. We also incline to think they should be regarded as mortgagor and mortgagee, (Code, §3329;) the plaintiff being the mortgagee, and Cuthbert the mortgagor. We think it is well settled by the authorities that a mortgagor cannot acquire a tax title to the prejudice of the mortgagee. This rule is based possibly on the thought that the mortgagor was bound to pay the taxes. In this case, the most that can be said is that Cuthbert obligated himself to pay all taxes lawfully imposed on the premises after he became the purchaser. *He was not bound to pay the prior taxes. But, as vendee or owner of the equitable title in possession, he was authorized to redeem from the prior tax sale;* and, when the expiration notice was served on him, we think it was his duty to do so. Rice v. Nelson, 27 Iowa, 148; Hunt v. Rowland, 22 Id., 53; Stears v. Hollenbeck, 38 Id., 550; Fair v. Brown, 40 Id., 209. Whatever was paid to effect such redemption would amount to a payment of so much of the purchase money due the plaintiff. Such being the duty of Cuthbert, it follows that he cannot be permitted to set up such tax title as against the plaintiff. His purchase of such title, under the agreed statement of facts, amounted simply to a redemption which inured to the benefit of the plaintiff. Counsel for the defendants cite, and seem to rely greatly on, Alexander v. Sully, 50 Iowa, 192; but it is, we think, clearly distinguishable." [Italics supplied.]

In Gilman v. Heitman, 137 Iowa 336, 113 N. W. 932, the plaintiff held the note of the owner of the land, and as collateral thereto he held three of a series of notes secured by a mortgage

on the property. For the extinguishment of his debt, he took a deed to the property and went into possession. Afterwards he procured a tax deed on tax certificate issued to him prior to the execution to him of his mortgage. He was under no obligation whatsoever to pay the taxes when he purchased at the tax sale. All taxes and liens were excepted from the covenants of his warranty deed, but he was not bound to pay them except to protect his property. Defendant procured judgment on her note of the series, and plaintiff brought this action to enjoin the execution of the sheriff's deed, basing his claim of title on the tax deed. In reversing a decree for plaintiff, this court held that he could not by the acquisition of the tax title divest the lien of his co-mortgagee.

In Patty v. Payne, 178 Iowa 593, 599, 159 N. W. 1012, 1014, the plaintiff and defendant, Cora Patty Payne, and another brother and sister were named as remaindermen in a deed conveying the life estate to their parents. While living as a child in the home of her parents on the property, Cora bought it at tax sale and procured tax deed. She then conveyed to her parents who later reconveyed to her and her defending brother and sister. Her parents as holders of the life estate had the primary duty of paying the taxes; but, Cora, as a remainderman, *had a right to pay the taxes* to protect the estate in common which would ultimately come to her and her brothers and sister. This court affirmed a decree in partition granting plaintiff a one-fourth share, saying:

"We think appellee's contention at this point must be sustained, and that Cora M. Patty could not, under the circumstances shown, take title as against her cotenants, and that the payment of the taxes by her inured to the benefit of all the cotenants, including plaintiff. This being so, subsequent deeds by Cora M. and by her mother and father back to the three heirs, would have no basis and would be, therefore, invalid."

In First Congregational Church v. Terry, 130 Iowa 513, 107 N. W. 305, 114 Am. St. Rep. 443, it appears that one Hale, by devise from his sister, received a life estate in a residence property, with remainder over to the plaintiff and other charities. He and his family thereafter occupied the property as their

homestead. As life tenant, he was charged with the duty of paying the taxes. He failed to do this, and his old friend Terry bought the property at tax sale, received tax deed, and conveyed the same, for the amount he had invested in the tax purchase, to Park, who, for the same consideration, conveyed to the wife of Hale, who was his daughter, and her minor children. Hale and his family continued to occupy the property until his death about two years later. Plaintiff brought this action to set aside the tax deed. Terry and others intervened. In reversing a decree for interveners, this court held that the transactions were the consummation of a collusive scheme to defeat the remaindermen, and speaking through Justice Weaver, 130 Iowa 513, 515, 107 N. W. 305, 114 Am. St. Rep. 443, said:

"Plaintiffs seek to set aside the title on the ground: First, that the procuring of the tax deed and the conveyance to the wife and children of Hale was accomplished by a fraudulent combination or conspiracy between Hale, Terry, and Park, to enable the said life tenant whose duty it was to pay the taxes to defeat and destroy the interest of the remaindermen in the property; second, that the wife and members of Hale's family residing with him on said homestead had an interest therein which would entitle them to redeem such property from tax sale, and they could not acquire a tax title thereto as against the head of the family; and that the taking of such title through Terry and Park operates in equity as a redemption from the sale for the benefit of the remaindermen; * * *."

After stating that a life tenant cannot by permitting the property to go to tax deed to himself thus destroy the remainder estate, the opinion continues:

"This being true, it is immaterial whether he takes the tax title direct *or by conveyance from some third person who has acquired it.* In neither case can he assert such title against the owners of the remainder, and his purchase will be held to operate as a mere redemption from the tax sale or payment of the taxes for which he was legally liable. Such would also be the necessary effect of a tax title taken by his procurement or for his use and benefit in the name of some other person. * * * equity

will not look with tolerance upon any scheme or plan which would enable him to make his own wrong and neglect of duty a means by which to destroy the estate of the remaindermen. * * * We may say, however, that even in the absence of any combination or collusion between the life tenant and Terry or the wife of the life tenant occupying the premises with her husband as a homestead, she could not obtain a valid tax title to the property as against her husband or against those to whom he owed the duty to keep down the taxes. * * * Burns v. Byrne, 45 Iowa 285. [And cases from other jurisdictions.] * * * *It is a general and just doctrine that a person having such an interest in land as would entitle him to redeem from tax sale cannot, by taking a tax title, eliminate the rights of others jointly interested with him in such property.* * * * [Citing Lane v. Wright, 121 Iowa 376; Cowdry v. Cuthbert, Garrettson v. Scofield, all cited herein, and Manning v. Bonard, 87 Iowa 648.] That the wife has an interest in the homestead which she is entitled to protect by redeeming from tax sale, there can be no room for doubt." (Italics ours.)

In Frank & Darrow v. Arnold, 73 Iowa 370, 35 N. W. 453, Parsons, the owner, mortgaged to Antes in 1875. The property was sold at tax sale in November 1881. Parsons quitclaimed to plaintiff in 1882. Antes foreclosed and the sheriff sold to plaintiff in 1884 and executed a deed to plaintiff in December 1885. Sigler was made a defendant in the foreclosure because he had procured a sheriff's deed in 1882 in the foreclosure of his junior mortgage, under which deed he at once took possession. In 1880 Sigler made an arrangement with Arnold to make tax sale investments. The tax sale purchases were not made by Sigler, but by Arnold and others. In the 1881 tax sale, the treasurer conveyed a portion of this land to Árnold and a portion to another. While Arnold and Sigler both testified that the lands were bought for Arnold, the court found that the interest therein of Sigler was such that as the holder of a junior lien, he could not thus defeat the superior liens of plaintiff. The tax deeds were set aside. Sigler as the holder of the junior mortgage was not bound to pay the taxes or to redeem, *but he had a right to do both* and could not destroy plaintiff's lien by circumvention.

In Cone v. Wood, 108 Iowa 260, 79 N. W. 86, 75 Am. St. Rep. 223, it appears that Hedges owned three lots in the south-

west corner of the block, fronting west and extending east, each 50 feet by 150 feet. Lot 17 was the south one, 18, the middle one, and 19, the north one. The combined area was 150 feet by 150 feet. He divided the tract the other way into three lots of the same size, all fronting south. He did not change the original platting, nor the record thereof. On July 8, 1889, he sold the east lot as redivided to Worden, who, about the same time, mortgaged it to the Missouri Kansas & Texas Trust Company, who foreclosed and procured sheriff's deed July 7, 1891, and sold to its affiliate, State Realty Company, January 1, 1893, which gave a mortgage back for the purchase price to the Trust Company. The middle lot is involved only incidentally in this litigation and may be disregarded.

Hedges sold the west lot to Cox who mortgaged back to Hedges, who assigned to defendant, Wood. The lots were assessed, as originally platted, in 1889, and were sold for the taxes of that year in 1890—lot 17 to Keegan, 18 to Tollefson, and 19 to the Trust Company which company acquired the other two certificates, January 7, 1891. The Trust Company paid all taxes on all the lots as platted for the year 1890. For the years 1891 and 1892 it paid the taxes on the east and middle lots, but not on the west lot. At the tax sale in 1892, it bid in the west lot for the taxes of 1891. In August 1893, it assigned its tax sale certificates of 1890 to Farrell, one of its officers, under an agreement that he would receive tax deeds to the lots as originally platted, and then convey the east one third, or the east lot as redivided to the Trust Company, or to whom it might direct, and would retain the west two thirds, or the middle and west lot for himself. By direction of the Trust Company, Farrell conveyed the east lot to State Realty Company. The west and middle lot, by mesne conveyances, came to the plaintiff, Cone, who was secretary of the Trust Company from March 1892 to May 1896.

Cone brought this action to quiet title. Wood answered denying the validity of the tax deeds, and offered to redeem. While Cone, even though an officer of the Trust Company, was under no personal obligation to pay any of the taxes, or to redeem, the court stated that it would treat the case as though the Trust Company was the plaintiff. From the statement of fact,

it will be noted that the Trust Company, under whom the plaintiff held, was under no primary duty to pay the taxes for the nonpayment of which plaintiff's tax title arose, but as the holder of a mortgage on but a third of the property, *it had a right to protect that third from a tax title,* even though to do so it was necessary to give similar protection to the other two thirds. In affirming a decree for defendant declaring the tax deeds void, 108 Iowa 260, 264, 79 N. W. 86, 87, 75 Am. St. Rep. 223, the court said:

"That the trust company had the right to pay the taxes on the property on which it held the mortgage, see Eck v. Swennumson, 73 Iowa, 423. The same case also announces the rule that a mortgagee cannot, by purchase at a tax sale, defeat a senior mortgage or acquire title against the mortgagor. The holdings are as to the specific land covered by the mortgage. The rule is that attempted purchases of that kind amount to a payment of the taxes, and not to a purchase. We notice these unquestioned rules, to have in mind how the relationship of mortgagee affected the trust company in what it did. Then, as to the part of the lots covered by its mortgage, it had the right to pay the taxes, and not to purchase it. But it could not do that."

After referring to certain Illinois and Michigan cases, the opinion continues:

"The case concludes with a holding that the purchase at the tax sale operated as a payment of the taxes and gave no title. Had the trust company owned the land its mortgage was on, we do not see why the two cases would not be alike in principle. The inhibitions of the rule apply as strongly to a mortgagee as to an owner. In the cases the inhibitions are made to depend at times on when the person has the 'right' to pay the taxes, and at others when he is under an 'obligation' to pay them. The distinction is not as important as it is thought to be. The words are many times interchangeable in their use. Sometimes the word 'obligation' is used to denote an agreement or undertaking to pay taxes; at others, it is used in the sense of an obligation to do so to protect an interest or title, as, in one sense, the owner of land is not under obligation to pay

the taxes thereon, for he may forfeit it, and yet in another sense he is under such an obligation in order to preserve his title. The same is to be said of a mortgagee whose interest requires such a payment for its protection. He must forfeit his lien or pay the taxes. The Illinois case speaks of the owner paying his proportion of taxes assessed, as if that might have been done, and we do not lose sight of the fact that, in this case, there was no defined way of doing that. But, without an attempt to point out a way for doing it, which we should not do, it is to be said that, whatever was the legal requirement to discharge the taxes from the mortgaged lot, he was compelled to do, and thus relieve the land that he could not purchase at tax sale, but might pay the taxes on. If the company must pay all taxes due on a lot and take an added lien therefor, or, if a proceeding might be adopted to fix its proportion, in either case we think, before it could purchase at tax sale, it must make such payment that, if it takes a title, it will not be based in part on its own default. The thought runs throughout the cases. As more or less sustaining the rule, see Maul v. Rider, 51 Pa. St. 377; Cooley v. Waterman, 16 Mich. 366; Manning v. Bonard, 87 Iowa, 648; Fair v. Brown, 40 Iowa, 209. It is true that few of the cases involve substantially the same facts. The general rule, in all its bearing, is against the right to acquire such a title. It could not be permitted, without involving complications that should be avoided.''

The principle announced in Fair v. Brown, supra (40 Iowa 209), and followed in the cases cited, has been stated in analogous cases. In Hunt v. Rowland, 22 Iowa 53, 55, where a vendee, in a bond for title, which did not provide who should pay the taxes, went into possession and sought indirectly through another to acquire a tax title against his vendor; the court in denying him this, said:

''Being thus liable, being bound upon legal *and equitable principles*, though not by express covenant, to keep down the incumbrances, he could not acquire a title against the vendor, by suffering the land to go to sale, and bidding it in for the taxes.'' See also Manning v. Bonard, 87 Iowa 648, 54 N. W. 459; Sorenson v. Davis, 83 Iowa 405, 49 N. W. 1004; Beacham v. Gurney, 91

Iowa 621, 60 N. W. 187; and National Surety Company v. Walker, 148 Iowa 157, 125 N. W. 338, 38 L. R. A., N. S., 333.

In Hawkeye Life Ins. Co. v. Valley-Des Moines Co., 220 Iowa 556, 563, 260 N. W. 669, 673, 105 A. L. R. 1018, the grantee in a tax deed, which was connected with a bank which had a mortgage on the premises, which bank or the landowner had furnished an employee of the latter the money to purchase at the tax sale, was held not to have divested the lien of plaintiff's special assessment, by the acquisition of the tax deed. The court said:

"It seems to be the well-settled rule in this state that neither a mortgagor nor a mortgagee can obtain a valid tax title to the exclusion of other lienholders." (Citing cases referred to herein.)

In Teget v. Lambach, 226 Iowa 1346, 1350, 286 N. W. 522, 525, 123 A. L. R. 392, the court held that the holder of a drainage district bond, since it was not a lien on any specific tract of land in the district, was not disqualified from acquiring a tax title to any such tract. This court, through Justice Hamilton, in speaking generally of those so disqualified, said:

"There are many persons who, by reason of their interest in the premises and their relationship to others interested therein, may not, for equitable reasons, become purchasers and these are dealt with and the equitable principles discussed and applied in the authorities above cited and need no further elaboration herein. Generally speaking, they include persons whose duty it is to pay the taxes or who have such an interest in the property that they might redeem the same from tax sale and save themselves from loss and injury, or those lienholders who may pay the taxes and are given a preferred lien over other lienholders and the titleholder for the amount of the taxes paid."

The overwhelming weight of authority supports the rule of this court as above set out. In section 370 of 26 R. C. L., page 412, it is stated as follows:

"It is a general principle of law that one who is under an obligation to pay the taxes on lands, such as a cotenant, a lessee,

a life tenant, a mortgagor or a mortgagee, cannot strengthen his title thereto by buying in the tax title when the property is sold as a consequence of his omission to make such payment. In such a case the sale will merely operate as a payment of the taxes and the title will be the same as it was before the sale, except that the lien for taxes is discharged. The effect of this principle cannot be evaded by the person under obligation to pay the taxes by allowing the property to be sold to a third person and then purchasing it from him.''

For like statements see 3 Cooley, Taxation (4th Ed.), sections 1437 to 1441; 123 A. L. R. 398 et seq.; 2 Jones on Mortgages (8th Ed.), sections 841 and 883; 75 Am. St. Rep. 229, 235, 243; 15 Am. Dec. 687 et seq.; 1 Blackwell on Tax Titles (5th Ed.), sections 566, 593 and 594; L. R. A. 1917D, 522 et seq. On page 527 of the last citation, the annotator states:

''One succeeding to the rights and liabilities of a senior mortgage cannot by purchasing at a sale for taxes which he was under obligation to pay cut off the junior mortgagee's right of redemption. So the rule is that a junior mortgagee cannot acquire a title by purchase at a tax sale which will be superior to that of the senior mortgagee, or which will defeat the lien of the latter's mortgage.''

Some courts in speaking of cotenants, and less often with respect to mortgagees, state that one not in possession is not so disqualified. This is contrary to the weight of authority, particularly with reference to mortgagees. 1 Blackwell on Tax Titles (5th Ed.), sections 566 and 593; 75 Am. St. Rep. 244; L. R. A. 1917D, 523. As expressed in the last citation:

'' * * * some courts have expressly ruled that a mortgagee out of possession will not be permitted to acquire and hold a tax title against the mortgagor, the view having been taken that while it may not be the duty of the mortgagee to pay the taxes, it is clearly his right to do so for the protection of his mortgage title, and it is presumed that when he does so purchase it is for the protection and not for the destruction of the regular title. In fact, it has been said that the mortgagee holds not only in trust for himself, but also for the mortgagor, the

common interest of the parties in the mortgaged property creating a relation of trust and confidence, and the presumption being that the mortgagee purchases to prevent a failure of the mortgagor's title and for the common protection.''

In 2 Jones on Mortgages (8th Ed.), section 883, the principle is thus stated:

'' * * * it would seem that the mortgagee, whether in possession or out of possession, in the absence of an agreement on his part to pay the taxes, is under duty to pay same on failure or neglect of the mortgagor to do so. The tax is paramount to the lien of the mortgagee as well as the title of the mortgagor, and neither are at liberty to neglect the payment thereof. If the duty of paying the taxes to protect the lien of the mortgagee, in default of such payment by the mortgagor, is upon the mortgagee, or if by reason of his mortgage, he has an interest in the land, then payment of taxes or redemption from sale therefor must be presumed to be for the benefit of the entire estate. The mortgagee's equitable interest in the land makes it his duty to see to it that the taxes are paid.''

In section 841 of the same work, the author states:

''When the taxes are paid by one who has merely a lien upon the land, there is of course no obligation upon him to pay the taxes; and although he may acquire the tax title for the protection of his own lien, he is not allowed to set up that title to defeat a prior lien. The land is regarded as a common fund for the payment of both liens, and equity regards it as an act of fraud for him to acquire a title to the land for an inconsiderable sum, and use it to destroy the claim of the prior mortgagee to the land. The most that can be said for the mortgagor or his grantee in such a case is that he becomes seised under the tax deed in trust for the mortgagee.''

Many authorities are cited in support by the above-mentioned commentators. Some of these cases and other later decisions to the same effect are: Connecticut Mut. L. Ins. Co. v. Bulte, 45 Mich. 113, 122, 7 N. W. 707, 710, wherein Justice Cooley said:

"When therefore each mortgagee has the same interest in making payment of the tax, and the same right to do so, and the same means of compelling repayment, it may well be held that a purchase by one shall not be suffered to cut off the right of the other, because it is based as much upon his own default as upon that of a party whose lien he seeks to extinguish. It is as just and as politic here as it is in the case of tenants in common, to hold that the purchase is only a payment of the tax."

The North Dakota court in Baird v. Fischer, 57 N. D. 167, 172, 220 N. W. 892, 894, after quoting at length from the foregoing Michigan opinion refers to Judge Cooley's opinion as "a classic statement of the reasons for holding that one mortgagee may not acquire and assert under a tax deed as against another mortgagee." Maxfield v. Willey, 46 Mich. 252, 9 N. W. 271 (Cooley, J.) ; Hall v. Westcott, 15 R. I. 373, 380, 5 A. 629, 632, the court saying:

"Our conclusion is that a mortgagee, either in possession or out of possession, is not entitled to purchase the estate at a tax sale, and set up the tax title as against the mortgagor *or the other mortgagees*. They all have a common interest in the preservation of the estate, and therefore, if either of them purchases the estate at a tax sale, it should be presumed in favor of the others that he made the purchase for the common protection." [Italics ours.]

Woodbury v. Swan, 59 N. H. 22, wherein it is said:

"Mortgagor and mortgagee have a unity of legal interest in the protection of their titles against sale for nonpayment of taxes, and against outstanding tax titles; and it is not equitable that either of them should act adversely to the other in the acquisition and use of such titles. * * * The common interest of these parties in the mortgaged property creates a relation of trust and confidence."

Laton v. Balcom, 64 N. H. 92, 6 A. 37, 10 Am. St. Rep. 381 (some legal or *moral* obligation to pay the tax) ; Cohea v. Hemingway, 71 Miss. 22, 14 So. 734, 42 Am. St. Rep. 449 (a co-owner, whether in or out of possession, cannot buy or hold a tax title against other cotenants) ; Stinson v. Connecticut Mut.

L. Ins. Co., 174 Ill. 125, 51 N. E. 193, 66 Am. St. Rep. 262, 264 (immaterial whether mortgagee is in or out of possession); Ragor v. Lomax, 22 Ill. App. 628 (same holding); Robinson v. Lewis, 68 Miss. 69, 8 So. 258, 10 L. R. A. 101, 24 Am. St. Rep. 254 (husband of cotenant cannot, by tax title, divest another cotenant); Burchard v. Roberts, 70 Wis. 111, 35 N. W. 286, 5 Am. St. Rep. 148 (mortgagee cannot cut off equity of redemption by tax title); Smith v. Lewis, 20 Wis. 369 (second mortgagee cannot divest first mortgagee by tax deed); Mills v. Tukey, 22 Cal. 373, 83 Am. Dec. 74 (doctrine that mortgagee cannot divest mortgagor by tax title rests upon the doctrine of constructive fraud); Christy v. Fisher, 58 Cal. 256; Moss v. Shear, 25 Cal. 38, 85 Am. Dec. 94, 96 (one under any legal or *moral obligation* to pay taxes, cannot by purchase at tax sale himself, or by subsequently buying from stranger who purchased at tax sale, add to or strengthen his title); Middletown Sav. Bk. v. Bacharach, 46 Conn. 513, 524 (wherein the court said: ''The word 'duty' constitutes the debatable ground. * * * It does not signify merely a legal obligation. * * * For instance, a purchaser of the property or of the equity of redemption subject to a tax lien; he may be compelled to pay the taxes in order to protect his own title. In such cases it is for his interest to do so. Necessity and interest combine to make it, in a broad sense, his duty to do so. Such a party ordinarily cannot be a purchaser of a tax title. So too a mortgagee is under no legal obligation to pay the taxes, certainly as between himself and the mortgagor; and yet he may be compelled to pay them in order to protect his mortgage. Although there may be cases which hold that under certain circumstances he may purchase a tax title, yet the general rule is that he cannot; and for the very good reason that it is not necessary for him to do so. He may pay the tax and the amount paid will be added to his debt, and he will hold the whole property as security therefor. In such a case it is unnecessary to complicate the legal title with a tax deed, and the law will not allow it to be done. It simply makes it his duty to pay in default of the mortgagor.''); Williams v. Maners, 179 Ark. 110, 14 S. W. 2d 1104 (wife of mortgagee by purchase at tax sale held to be redemptioner as against second mortgagee); Cole v. Swift, 190 Ark. 499, 79 S. W. 2d 426 (mortgagee attempted to purchase mortgagor's

equity of redemption at much less than value) ; Bartel v. Ingram, 178 Ark. 699, 11 S. W. 2d 488 (mortgagee who had assigned and guaranteed payment could not acquire tax title adverse to mortgagor) ; Kane v. Eustis, 106 Fla. 817, 819, 143 So. 655, 656 (in this case a second mortgagee acquiring tax title from a stranger who had received tax deed was held not to have divested the lien of a first mortgage. The court said: ''While in the case before us no obligation rested upon Zimmerman, as a second mortgagee, to pay the taxes on the land for the benefit of the owner, for he was simply a lienholder, and was bound neither by the law nor by his contract to pay the taxes which were the foundation of his after-acquired tax title, yet the land on which his second mortgage was a lien is to be regarded as a common fund for the payment of both the first and second mortgages, which fact entitled either or both of them to redeem from the tax sale, or to accomplish the same result by buying from another the interest, if any, acquired by him under a tax deed procured for nonpayment of the taxes accruing against the mortgaged land.'') ; Mivelaz v. Bonner, 200 Ark. 1189, 141 S. W. 2d 22 (purchase of tax title by a mortgagee held to be a redemption) ; Quinby v. Meyer, 110 Fla. 445, 148 So. 869 (second mortgagee cannot buy mortgaged lands at tax sale and acquire title adverse to prior mortgagee) ; Templeman v. Williams, 166 Ga. 60, 142 S. E. 534 (owner securing indirectly tax title from stranger holding tax deed for 20 months held to have made redemption for purchase money mortgage) ; Bourquin v. Bourquin, 120 Ga. 115, 47 S. E. 639 (the court held that one under obligation to pay taxes could not, directly or indirectly, from an innocent tax deed holder, acquire a tax title adverse to those to whom he was obligated) ; Johnson v. King Lbr. Co., 39 Ga. App. 280, 147 S. E. 142 (held that grantee in a security deed could not acquire a valid tax title by paying taxes to a stranger who had purchased at tax sale, even though time for redemption from tax sale had passed) ; Adams v. Snyder, 137 Kan. 365, 20 P. 2d 827 (held that where owner colluded with tax sale purchaser to defeat mortgagee, the tax title was invalid) ; Klumpp v. Fontenot, 11 La. App. 27, 122 So. 503 (held facts showed property was purchased at tax sale by brother of owner for nominal amount to defeat incumbrancers) ; Des Moines Sav. Bk. & Tr. Co. v. Eisenmenger, 183

Minn. 46, 235 N. W. 390 (held that successive mortgagees were in the same category equitably as tenants in common respecting duty to protect against adverse tax title) ; Norton v. Metropolitan L. Ins. Co., 74 Minn. 484, 77 N. W. 298, 539 (held it was as much the duty of one mortgagee as another to protect common security against tax title) ; Chartz v. Cardelli, 53 Nev. 13, 291 P. 311; Riley v. Bank of Commerce, 37 N. M. 338, 23 P. 2d 362 (first mortgagee cannot acquire tax title as against second mortgagee) ; Baird v. Fischer, 57 N. D. 167, 220 N. W. 892 (held that second mortgagee acquiring tax title from stranger holding tax deed cannot assert the tax title against prior mortgagee) ; Metropolitan L. Ins. Co. v. Frick, 61 S. D. 9, 245 N. W. 921 (mortgagee cannot acquire tax title against mortgagor) ; Dalton v. Lessard, 136 Me. 94, 96, 2 A. 2d 172, 173 (held that lessor who failed to give agreed notice of default to lessee for nonpayment of taxes, could not by severing lease relationship and acquiring tax title from stranger holding tax deed for two years, defeat tenant's rights. The court said: "The decisive factor is not that the obligation to pay the tax rests on the one asserting the title, but the real question is whether on broad equitable grounds he should be estopped to assert the title which he holds.") ; York Co. Sav. Bk. v. Wentworth, 136 Me. 330, 9 A. 2d 265, 125 A. L. R. 1509 (affirming statement just above) ; Smith v. Specht, 58 N. J. Eq. 47, 42 A. 599 (broad dictum laid down that tenant cannot buy in the property at tax sale and hold it against lessor, even though duty to pay tax is on the latter) ; Bryan v. Knox, 138 Fla. 452, 189 So. 700 (daughter of mortgagor cannot procure tax deed and defeat lien of mortgage) ; Torreyson v. Dutton, 137 Fla. 683, 188 So. 805; Battin v. Woods, 27 W. Va. 58, 67 (wherein the court said: "One, whose duty it was to pay the taxes on land, cannot gain an advantage in respect to the title, by allowing the land to be sold for taxes and buying it in himself or buying it from a stranger, who bought it at the sale.") ; Oregon Mtg. Co. v. Leavenworth Sec. Corp., 197 Wash. 436, 86 P. 2d 206 (held that junior mortgagee acquiring tax title from one acting for it holding tax deed, could not defeat the lien of a senior mortgage) ; Albergo v. Gigliotti, 96 Utah 170, 85 P. 2d 107 (son of mortgagor receiving quitclaim deed from county holding auditor's tax deed could not thus de-

feat lien of mortgagee); Hadlock v. Drainage District, 89 Utah 94, 53 P. 2d 1156, 106 A. L. R. 876 (holds that deed by county to property acquired by it at tax sale, to one who had taken a quitclaim deed from owner in satisfaction of mortgage does not create new title to which lien of unpaid drainage district taxes does not attach); Rives v. Anderson, 128 Fla. 794, 175 So. 897 (junior mortgagee cannot defeat senior mortgage by tax title); Pacific Coast Inv. Co. v. Jones, 155 Or. 244, 63 P. 2d 888 (mortgagee cannot by tax title defeat assignee of mortgage); Marwalt Realty Co. v. Greene, 224 Wis. 1, 271 N. W. 648 (neither mortgagor nor mortgagee may acquire tax title against the other); Ripley v. Schenck, 126 A. 603 (N. J. Court of Chancery); Hurt v. Schneider, 61 Colo. 104, 156 P. 600, L. R. A. 1916F, 204 (holding that a tenant who has covenanted to pay the taxes on a leasehold cannot, on account of the fealty which he owes to his landlord, acquire title under sale for taxes *for a year prior to the execution of his lease*); Burns v. Byrne, 45 Iowa 285 (holding that the second husband of the widow of·an intestate cannot divest the interest of a sister of the deceased by acquiring a tax title). See also dissenting opinion of Justice Morling in Wood v. Schwartz, 212 Iowa 462, 236 N. W. 491.

There are some cases which adopt a narrower view than the authorities above cited, and maintain that any person may acquire a tax title, who is not under a legal duty to pay the taxes. See decisions and citations in Owens v. Williams, 180 Okla. 324, 68 P. 2d 836; Jones v. Black, 18 Okla. 344, 88 P. 1052, 11 Ann. Cas. 753, with dissenting opinion in 90 P. 422; and Simmons v. Kelly, La. App., 169 So. 791.

II. The appellant offers little authority against the principle discussed in the preceding division. But aside from the contention that it was not the holder of a mortgage or lien when it received the deed from Miller, it urges, that, if this were not so, it was not under such obligation to pay the taxes or to redeem, as to disqualify it from .acquiring the title which Miller held. It relies upon a statement in the majority opinion in Wood v. Schwartz, 212 Iowa 462, 236 N.·W. 491, found on page 469 of the Iowa Report, page 494 of 236 N. W., to wit:

"While she may have had such interest as, that she had the right or privilege to redeem, there was no duty resting upon

her, as between her and the mortgagee, to make the redemption. *There is a vast difference between duty and right or privilege."* (Italics ours.)

Of course there is a difference. No one will dispute the correctness of the italicized statement if it be considered in an abstract and unrelated sense. But it must be considered in relation to the subject matter treated in the context. With respect to the matter before us for determination, it must be applied to the appellant as a junior mortgagee or lienholder seeking to divest the prior liens of the appellees by the procurement of a tax title. Considered in that setting, it is an erroneous, and an unsound principle of law, and contrary to our own decisions, and the great preponderance of authority. As a statement of law in that sense, it is overruled. It is immaterial what name may be given to the relation of the appellant toward the taxes on the property, it suffices that its binding character was such that it could not, by failing to pay them, or to make redemption from the tax sale, either directly or indirectly, acquire a tax title destructive of the liens of the appellees.

 III. The record definitely establishes that the appellant was advised of these legal difficulties which opposed its purpose to secure a valid tax title paramount to the liens of the appellees, so long as its status was that of a lienholder. To "better its position," and to avoid these obstacles, it made the arrangement with Miller set forth herein. It released its mortgage, but not until it had made an agreement with Miller for a deed to it of whatever title he could convey under his tax deed. Appellant realized that the title it would receive might be clouded, but it was willing to take a chance. The trial court concluded "that the bank did not unburden itself of its lien on the land by this device." We agree with this conclusion. The release was not in good faith. The condition and terms upon which it was executed defeated its purported effect. The appellant rather halfheartedly claims that there was no collusion in the arrangement. But its version of the transaction is all too seemingly artless to impress us as a frank narration of what in fact took place. Appellant insists that the appellees placed upon the witness stand those who testified to the transaction between the bank and Miller, and having thus vouched for their credibility is

bound by their testimony. It is upon the testimony of these witnesses, considered in its entirety and not upon isolated statements, that we find the appellees have sustained the allegations of their pleadings. The interest of these witnesses was against the appellees, but they were compelled to use them. This fact must be considered in evaluating their testimony. Sinift v. Sinift, 229 Iowa 56, 74, 293 N. W. 841.

"It is true that fraud is never presumed, but it is equally true that it is almost altogether impossible to prove it by direct evidence. Hence, in such cases, it is only by reasonable inferences or deductions as a general rule that it can be established." Klumpp v. Fontenot, supra, 11 La. App. 27, 31, 122 So. 503, 505.

In the case before us, the direct evidence of Dahl and Miller establish the fact of the collusive arrangement between them. The result of appellant's dealings with Miller was not the acquisition of a valid tax title, but was only a redemption from the tax sale, with rights of subrogation under the tax sale.

IV. Appellant claims something from the fact that Miller was a good faith purchaser at the tax sale. There is nothing in the record to indicate the contrary. It also claims that Miller by his tax deed obtained a new title by independent grant from the government. While it is true that ordinarily a tax deed creates such a title, it is also true that where the transaction is but a subterfuge, and a wrongful conspiracy between the holder of the tax certificate and one under obligation to protect against a tax title, by which the latter divests himself of his mortgage lien, or otherwise avoids his obligation, the tax title secured by him is void and passes no title. Bryan v. Knox, 138 Fla. 452, 189 So. 700. Appellant contends that the transaction was not of that character. If this be conceded for the purpose of argument, and for that purpose alone, as we find to the contrary, nevertheless the appellant did not receive an indefeasible title good as against the world.

Appellant relies upon a statement in Wood v. Schwartz, supra, (212 Iowa 462, 466, 236 N. W. 491, 493) that a tax title received from a stranger who had previously procured a tax deed was indefeasible and good as against the world, and that: "It is an axiomatic truth that one can convey as good a title as

he holds.'' This is stating the rule too broadly and too unqualifiedly. In general it is true, but it is subject to an important and an unstated exception, within which we find the appellant. It is also axiomatic that the disqualification of one, in the relation of the appellant to the land and to others situated as are the appellees, rests upon the principle that it is under a legal and moral duty to pay the taxes. It cannot build a title on its own default or build a title on its own neglect of duty. Winter v. City Council of Montgomery, 101 Ala. 649, 14 So. 659. We may.concede, arguendo, that Miller by his title obtained an indefeasible title, unincumbered by any claims or equities against former owners, or by liens against the land, so long as he retained the title, or did not convey to one under obligation to preserve and protect those liens or the title upon which they depended. In other words, one who is under obligation to protect land against a tax title is disqualified to receive a valid tax title based upon his failure to meet that obligation, either by having failed to pay the taxes or to make redemption. The appellant, therefore, could not receive as good and as indefeasible title as Miller may have had.

The principle is akin to the well established one that a bona fide purchaser can transfer a good title even to one who purchases with notice of equitable claims of others. To this general rule there is the exception, that the protection does not extend to the one guilty of the constructive fraud, even if he purchases from a bona fide purchaser. The rule as stated in Story on Equity, section 410, is, '' [that] it is wholly immaterial of what nature the equity is, whether it is a lien or an incumbrance, or a trust, or any other claim; for a bona fide purchase of an estate, for a valuable consideration, purges away the equity from the estate, in the hands of all persons who may derive title under it, *with the exception of the original party, whose conscience stands bound by the violation of his trust and meditated fraud. But if the estate becomes re-vested in him, the original equity will re-attach to it in his hands.''* (Italics ours.) See also 2 Pomeroy's. Equity Jurisprudence, section 754 (4th Ed.) ; Clark v. McNeal, 114 N. Y. 287, 21 N. E. 405, 11 Am. St. Rep. 638; Newmyer v. Tax Service Corp., 87 Colo. 474, 289 P. 365; Phillis v. Gross, 32 S. D. 438, 143 N. W. 373, 376; Andrews v. Robertson, 111 Wis. 334, 87 N. W. 190, 87 Am. St. Rep. 870, 54 L. R. A. 673, 680;

Torreyson v. Dutton, 137 Fla. 683, 691, 188 So. 805, 808, is a case wherein the mortgagor sought to obtain a tax title arising from his default. Of such a tax title the court said:

"But while such new and independent title results from the issuance of a valid tax deed, or from the foreclosure of a tax sale certificate, such new and independent title becomes ineffectual when it is again vested in a mortgagor whose mortgage remains outstanding and unsatisfied and the encumbrance is revived by such re-acquisition of title. Especially must this be true where the genesis of the newly acquired title finds basis in the default of the mortgagor to respect and abide by the covenants contained in his mortgage."

In Bourquin v. Bourquin, 120 Ga. 115, 118, 47 S. E. 639, 640, one who was under obligation to pay the taxes, as trustee, obtained a tax title, individually, from one claimed to have been an innocent purchaser at the tax sale. The court held that the acquisition of the tax title was to be treated merely as a payment, saying:

"When, therefore, Bourquin individually took a deed to the trust property from Kaufman, he unintentionally corrected the wrong of which he had previously been guilty, and the original status was restored; and whether this deed is treated as a redemption before the expiration of the 12 months, or as an independent purchase after the redemption year, the title to the land wrongfully allowed to be sold for taxes was thereafter held by him under the trust as it existed prior to his breach of duty. * * * If there was no collusion in the bidding or redemption, and if Kaufman was an innocent purchaser, this makes no difference. The principle that one without notice can convey to one with notice (Civ. Code 1895, section 3938) is subject to an exception where the transfer is back to him who was guilty of the actual or constructive fraud in first transferring, or in permitting the property to be transferred, to an innocent purchaser. When the title revests in the wrongdoer, the original equity will reattach to it in his hands. It has been so held in reference to the transfer of negotiable papers, and the same exception applies in regard to real property. * * * Were this not the rule, nothing would be easier than for a trustee to take advantage of his own

wrong. It would only be necessary for him to make or permit a wrongful sale, in his individual capacity buy from the innocent purchaser, and then rely on the conveyance back as a shield with which to protect himself when sued for the very property which in the first instance, through a breach of duty, he allowed to be sold.''

In Dubois v. Campau, 24 Mich. 360, a case holding that one tenant in common, without reference to the question of possession, cannot procure the title of his cotenant, through tax sale proceedings arising from the nonpayment of taxes part of which were on his share, the court in an opinion concurred in by Justice Cooley, said on page 368 et seq.:

''Of course if such co-tenant procure another person to bid in the property for him, and to take the deed, this will give him no greater right.

''But it is urged that if the land is bid in by a stranger, on his own account, and without any understanding or collusion with the co-tenant, and a deed be given to the purchaser, such tenant, though the sale have been based in part upon his own default, may purchase in the title and thus acquire the interest of his co-tenant, and set it up against him. * * *

''It was, therefore, the clear duty of Joseph Campau, upon the hypothesis of the case now under consideration, to pay the whole of the tax for which this sale was made; and the neglect or violation of this duty, in allowing the land to be sold for the taxes, was a wrong both to the other owners in common (who had a right to rely upon his performing that duty), and to the public. And though Palms, the purchaser, might assert his title against all the owners, as he violated no duty and was guilty of no wrong; yet Joseph Campau, the party thus in default, when he should subsequently purchase in the title so sold, would be thereby merely correcting the wrong he previously committed; and the payment to the purchaser and conveyance to himself, would operate merely as a payment of the tax, and give him no greater rights than if he had paid it when it became due, as it was his duty to have done. To allow him to set it up as a title to defeat that of the other owners, under such circumstances, would be to enable him to take advantage

of his own wrong to the injury of others, and to encourage fraud. * * *

"But in a case where a party whose duty it is to pay all the taxes on the land, allows it to be sold for such taxes to a stranger who might hold the whole against all parties, though this may terminate the tenancy while such tax-title is held by another, yet it has been terminated by the wrong of the party in default; and when he purchases in the title, he and the former owners are remitted to their original position and rights as they stood before the sale, and as they would have stood had the taxes been paid when due, or had the sale for the taxes been made directly to such party in default. Such, we think, must be the result upon principle."

This court announced the same rule in First Cong. Church v. Terry, supra, 130 Iowa 513, 518, 107 N. W. 305, 306, 114 Am. St. Rep. 443, in the statement:

"We may say, however, *that even in the absence of any combination or collusion* * * * she could not obtain a valid tax title to the property as against her husband or against those to whom he owed the duty to keep down the taxes." (Italics ours.)

We have also held that one holding a title indefeasible in himself cannot always pass such indefeasibility on to his grantee. In Cowdry v. Cuthbert, supra, 71 Iowa 733, 29 N. W. 798, one Simmons, who, so far as the record discloses was a stranger to the title and purchased innocently, received a tax deed giving him an indefeasible title, purged of any liens or title in both the vendor and vendee. But when he conveyed to the vendee, the relationship of the latter to his vendor under the contract of purchase was restored and the land again became security for the deferred payments. A tax deed may destroy the lien of a judgment, mortgage, etc., or the obligations of a previously existing status, with respect to the grantee in a tax deed or to strangers to whom he may convey, but the debt or the status is not destroyed, and when the title comes back to an original obligor, the old liens and status are ordinarily restored. If the law were otherwise, it would present an open door for the successful perpetration of fraud. As stated by Justice Weaver in

First Cong. Church v. Terry, supra, 130 Iowa 513, 519, 107 N. W. 305, 307, 114 Am. St. Rep. 443:

"The opportunities which would be afforded for fraudulent practices would be so numerous and the difficulty of exposing them so great that courts apply the doctrine of estoppel to both, to close the door to temptation."

In Peak v. Peak, 228 Mo. 536, 554, 128 S. W. 981, 986, 137 Am. St. Rep. 638, 648, in speaking by quotation and directly of the principle involved, and of one under obligation to protect a title, said:

"'Not only so, but she was placed in a most delicate and anxious position—a position watched by a chancellor with a solicitous eye, to be weighed and considered with a piercing and distinguishing judgment; *because duty and power of performance were set over against self-interest.* She set one in one eye and the other in the other. The love of money is the root of all evil; and when one is bound in a confidential relation, it is of the very essence of things to see to it that the strident and clamorous voice of self-interest does not drown out the still, small voice of duty and conscience. * * * Such purchase becomes of a poisonous character. The temptation existing, the correlative duty to remove it exists.'"

There can be no question of the authority and right of the appellant to pay the taxes or to make redemption. Its mortgage gave it such authority. So, also, do our decisions. As stated in Rice v. Nelson, 27 Iowa 148, 151: "It may, therefore, be laid down as a general rule, that any right, whether in law or equity, whether perfect or inchoate, whether in possession or action, amounts to ownership in the land, and that a charge or lien upon it constitutes the person claiming it an owner, so far as it is necessary to give him the right to redeem." See also Bates v. Pabst, 223 Iowa 534, 273 N. W. 151; Busch v. Hall, 119 Iowa 279, 282, 93 N. W. 356, 357, and cases cited. Having the right to redeem, appellant was disqualified to procure a tax title adverse to appellees. First Cong. Church v. Terry, supra; Cowdry v. Cuthbert, supra.

There are two or three cases of this court out of line with

the principles stated herein and announced by this court and by almost universal authority generally. In Crawford v. Meis, 123 Iowa 610, 99 N. W. 186, 66 L. R. A. 154, 101 Am. St. Rep. 337, in one phase of the case, the court held that a brother of the life tenant, during the period of the life tenancy, could procure a tax deed and convey a valid tax title to some of the remaindermen and thus divest other remaindermen holding under the same muniment of title and having the same rights. The court did this in spite of its holding that a remainderman may protect his interest in expectancy against a tax title. The decision invites the temptation and the collusion which equitable principles and public policy condemns. Insofar as such contrary principle may be held in Crawford v. Meis, and Wood v. Schwartz, both supra, and Alexander v. Sully, 50 Iowa 192, it is overruled.

The collusive arrangement, which the trial court found and which we find, disqualified the appellant to acquire a valid tax title adverse to appellees, but if there were no such collusion, that fact does not avail the appellant.

V. What we have said disposes of appellants' contention that appellees did not bring themselves within the provisions of Iowa Code section 7290. Appellant did not receive and does not hold a valid tax title. All it effected was a redemption from the tax sale. If the tax deed be considered as void because of Miller's participation in the wrongful arrangement, then, of course, the section does not apply. Hawkeye L. Ins. Co. v. Valley-Des Moines Co., supra, 220 Iowa 556, 260 N. W. 669, 105 A. L. R. 1018; Klumpp v. Fontenot, supra, 11 La. App. 27, 122 So. 503. And if it be considered a valid tax deed, this action is not an attack upon it, *as such,* nor does it charge invalidity in any procedural steps essential to its issuance, but it does attack the *capacity* and the *qualification* of the appellant to receive a valid tax title under it. See Austin v. Barrett, supra, 44 Iowa 488, 490; Blumenthal v. Culver, 116 Iowa 326, 330, 331, 89 N. W. 1116; Gilman v. Heitman, supra, 137 Iowa 336, 349, 113 N. W. 932; Proctor v. Williamson, 205 Iowa 127, 131, 215 N. W. 593; Wood v. Schwartz, supra.

Appellant is entitled to reimbursement for so much of what it paid to Miller as would have been required to make redemp-

tion, and to no more, and to a preferential lien on the property therefor. National Surety Co. v. Walker, supra, 148 Iowa 157, 168, 125 N. W. 338, 38 L. R. A., N. S., 333; Garrettson v. Scofield, supra, 44 Iowa 35; Eyres v. Koehler, 212 Iowa 1290, 1294, 237 N. W. 351. This the trial court gave to it. The decree is affirmed.—Affirmed.

HALE, C. J., and SAGER, MITCHELL, OLIVER, and WENNERSTRUM, JJ., concur.

MILLER and GARFIELD, JJ., concur in result.

STIGER, J., dissents.

STIGER, J. (dissenting)—I respectfully dissent from majority opinion for reasons set out in original opinion in 289 N. W. 447.